IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
_____ DIVISION
No. _____

| | |
|---|---|
| MC BOTANICALS LLC and MC NUTRACEUTICALS LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    **VERIFIED COMPLAINT** |
| | ) |
| ASTERRA LABS, LLC; RISE CAPITAL, LLC; and RYAN MCCONNELL; | ) ) ) |
| Defendants. | ) ) |

Since its founding in 2019, Defendant Asterra Labs, LLC ("Asterra") and its private equity backer, Defendant Rise Capital, LLC ("Rise Capital"), had sought to leverage their powerful, North Carolina-based political and financial networks to gain a toehold in the national cannabinoid market. Almost five years and over ten million dollars later, they had little to show for their efforts: poor distribution infrastructure; underdeveloped inventory management systems; little industry know-how; and no profits.

Hustling to avoid embarrassment and maintain a façade of being savvy operators in a promising new market sector, Defendants caught a lucky break when Plaintiff MC Nutraceuticals LLC ("MC Nutraceuticals"; together with its affiliates, collectively, "MC"), the national industry leader in bulk cannabinoids, agreed to enter into a long-term, mutually-beneficial relationship with Asterra. Under their

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

agreement, MC would create a new entity, Plaintiff MC Botanicals, LLC ("MC Botanicals"), to provide the industry expertise and market position that Asterra lacked. In exchange, Rise Capital, through its manager Harry L. Smith Jr. ("Mr. Smith"), promised a favorable financing arrangement, and Asterra, through its President Rep. John R. Bell, IV ("Rep. Bell"), promised to handle product fulfillment at scale.

Asterra and Rise Capital failed to hold up their end of the bargain, and Asterra breached its contractual obligations to MC Botanicals almost immediately. MC fortunately was able to cover, sending employees to North Carolina to all but take over Asterra's operations. Their interventions helped, and Asterra's monthly revenue more than doubled.

Asterra and Rise Capital, however, were not satisfied with the arrangement. While MC had given Defendants their industry training wheels and earned them more revenue than what they had seen in the past five years, Defendants saw no reason why MC should get *any* cut of the business, despite what the parties had agreed. Accordingly, beginning in early June 2025, Rise Capital and Asterra embarked on a campaign to squeeze MC out so that Defendants could convert MC's inventory and personnel for themselves. This campaign included escalating threats from Defendants to use their principals' positions of power and influence in North Carolina to prosecute and jail MC's executives if MC failed to deliver sums of money Defendants claimed to be due under the parties' contract.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

Alarmed, MC has had no choice but to file the instant complaint and to seek immediate injunctive relief to enjoin Asterra from improperly converting and selling the MC Botanicals inventory in its possession, and to enjoin MC's poached employee, Defendant Ryan McConnell ("Mr. McConnell"), from using MC's trade secrets and other confidential, proprietary information in service of Defendants' plan to enrich themselves at MC's expense.

## PARTIES

1.     MC Botanicals is a Texas limited liability company with a registered office in Wake County, North Carolina and its principal place of business in Argyle, Texas. Jeffrey Worley ("Jeff Worley") and Bret Worley ("Bret Worley") are its officers.

2.     MC Nutraceuticals is a Texas limited liability company with a principal place of business in Golden, Colorado. Jeff Worley and Bret Worley are its officers as well.

3.     Asterra is a North Carolina limited liability company with its registered office and principal place of business in Nash County, North Carolina. Rep. Bell, who serves as Chairman of the Rules Committee of the North Carolina House, is Asterra's President.

4.     Rise Capital is a North Carolina limited liability company with a registered office in Pitt County, North Carolina, and a principal place of business in Carteret County, North Carolina. Mr. Smith, former Chair of the University of North Carolina Board of Trustees, is its manager.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

5.     Upon information and belief, Mr. McConnell was a citizen and resident of North Carolina, at times relevant to this action. His address at time of the filing of this action is unknown.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the matter in controversy exceeds the sum or value of $75,000 and involves claims between citizens of different states, as well as 28 U.S.C. §§ 1331 and 1367(a), in that Plaintiffs' claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, presents a federal question and Plaintiffs' remaining claims are part of the same case and controversy as the claim arising under federal law.

7.     Defendants are subject to personal jurisdiction in this State pursuant to Article 6A, Chapter 1, of the General Statues of North Carolina, including, without limitation, N.C. Gen. Stat. § 1-75.4, and Defendants each have sufficient minimum contacts with this forum, including but not limited to their contacts relating to the agreements at issue here, to justify the assertion of personal jurisdiction over them in this Court.

8.     Venue is proper in this district, where Defendants Asterra and Rise Capital maintain their principal places of business, pursuant to 28 U.S.C. § 1391(b)(2), because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims at issue in this action occurred.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

## SUMMARY OF RELEVANT FACTS

### Overview of MC's Business

9.     Jeff and Bret Worley, a father and son team, founded MC Nutraceuticals in 2020. MC Nutraceuticals is a national industry leader in lobbying, regulatory reform and distribution in the industrial hemp-based bulk sector, with operations focused on federally-legal cannabinoids.

10.     Since its founding, MC's business portfolio has expanded to include, without limitation, federally-legal cannabinoid sales; federally-legal cannabinoid distribution; direct-to-consumer products; finished goods; industry consulting; product development; scientific research; and regulatory support and advising on legislative matters. MC Nutraceuticals is regularly asked to present at industry trade shows world-wide. It has been recognized by Forbes Magazine and The Financial Times as an industry leader.

11.     Bret Worley is often featured, in his individual capacity and on behalf of MC, in media coverage of the "new hemp economy" that includes hemp's potential for uses as varied as human consumption; animal feed; renewable energy; building materials; sea walls; agriculture; and bioplastics.

12.     MC has grown year over year. MC grossed $12 million, $24 million, and $48 million in 2022, 2023, and 2024, respectively.

13.     In early 2025, MC became interested in expanding opportunities to distribute hemp-derived cannabinoids.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

## Asterra's Failures to Launch

14.     Asterra seemed to offer such an opportunity to MC, with access to capital and the North Carolina market. MC, for its part, presented much-needed industry experience and know-how that could legitimize Asterra and give the company a foot in the door to this emerging market.

15.     Founded in 2019, Asterra billed itself as a producer, manufacturer, and distributor of "premium wholesale and white label CBD and hemp products," but the company had struggled to find its footing in the hemp-derived flower and cannabinoid product market.

16.     Asterra had the advantage of being able to leverage large amounts of capital through its North Carolina-based private equity owner Rise Capital, and a powerful political North Carolina network. Despite these advantages, however, Asterra had failed to develop basic competencies necessary to compete effectively in the regulated hemp-derived flower and cannabinoid marketplace.

17.     By 2024, Rise Capital had already sunk approximately $10 million into Asterra.

18.     Despite this enormous investment, Asterra had developed only a small finished-goods revenue stream.

19.     Prior to its partnership with MC, Asterra was mostly cash flow negative.

20.     Upon information and belief, in 2024, Asterra had only achieved roughly $100,000 in monthly gross revenue, while at the same time incurring an estimated $70,000 a month in negative cash flow. This was their high water mark.

6

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

21.     Despite its repeated failures to find its footing, Asterra held itself out as North Carolina's "first manufacturer of pharmaceutical-grade hemp products," "utiliz[ing] top-of-the-line equipment and facilities manned by industry experts."

22.     Attracted by Rise Capital's substantial financing capabilities and Rep. Bell and Mr. Smith's powerful political networks, MC approached Asterra in December 2024 about forming a commercial relationship whereby MC, for all intents and purposes, would help Asterra find its footing in the dynamic and intensely competitive regulated cannabinoid market.

23.     Asterra recognized the opportunity and agreed.

<u>Asterra Contracts with MC Botanicals For an Industry Toehold</u>

24.     MC Botanicals was the entity set up and used to memorialize the relationship with Asterra on the new venture. MC Botanicals would source products and market finished goods to MC's customer base. Asterra would finance and manage inventory and fulfill orders of cannabinoid ingredients for the finished goods.

25.     MC Botanicals and Asterra entered into a Manufacturing and Distribution Agreement (the "Manufacturing and Distribution Agreement"). A true and correct copy of this agreement is attached hereto as <u>Exhibit A</u> and incorporated by reference herein.

26.     The Manufacturing and Distribution Agreement provides, among other things, that:

[Paragraph allegations continue on the following page]

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

a. MC Botanicals acts as procurement agent for Asterra, sourcing product ingredients and advising Asterra what to buy, from whom, and at what price. (Ex. A, Recital A, §§ 1-2).

b. Asterra, relying on MC Botanicals' advice, issues a purchase order for product ingredients (each, a "Purchase Order") (*Id.* at § 1).

c. Asterra, with financial backing from Rise Capital, finances the Purchase Order. (*Id.* at §§ 2-3).

d. Once product ingredients are purchased pursuant to a Purchase Order, title to those product ingredients is transferred to MC Botanicals, which owns the inventory (the "MC Botanicals Inventory").

e. The MC Botanicals Inventory is delivered into Asterra's possession at its Nash County, North Carolina facility.

f. Asterra remains responsible for managing the MC Botanicals Inventory in its possession. Its fulfillment obligations include, without limitation, performing quality control for the MC Botanicals Inventory and absorbing packaging and shipping costs. (*Id.* at §§ 2, 4-5).

g. Once Asterra finances the purchase of MC Botanicals Inventory to fulfill a Purchase Order, it issues an invoice to MC Botanicals (each, an "Asterra Invoice"). (*Id.* at § 3).

h. MC Botanicals then has 30 days to pay Asterra the invoiced amount reflecting the purchase money advanced by Asterra pursuant to its financing obligations. (*Id.* at § 3).

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

i. In the event MC Botanicals does not pay an Asterra Invoice within 30 days, Asterra can charge interest at the lesser rate of 1.5% per month or the highest rate permissible under applicable law. (*Id.*).

j. Asterra, using financing from Rise Capital, provides MC Botanicals a credit facility with a limit of $2.5 million. (*Id.* at § 3.3).

k. Asterra is obligated to replace or offer MC Botanicals refunds for products deemed to be non-complying by MC Botanicals, subject to certain terms and conditions. (*Id.* at § 5).

l. Each party is obligated to provide documents, data, or other information reasonably requested by the other for fulfillment of its responsibilities under the Manufacturing and Distribution Agreement. (*Id.* at § 7).

m. The terms of MC Botanicals Purchase Orders and Asterra Invoices are incorporated into the Manufacturing and Distribution Agreement and subject to the terms and conditions of the Manufacturing and Distribution Agreement. (*Id.* at §§ 3, 18).

n. Each party is obligated to indemnify the other for, among other things, infringement of the other's intellectual property rights (or the infringement by such party's affiliates, employees, or representatives) and gross negligence. (*Id.* at § 14).

o. If any party institutes any legal suit, action, or proceeding against the other party arising out of the agreement, the prevailing party is entitled to receive costs and attorneys' fees. (*Id.* at § 18).

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

p. For the performance of its obligations, Asterra receives $50.00 per kilogram or pound (depending on product) for each unit of MC Botanicals Inventory fulfilled and shipped for use in finished goods. (*Id.* at § 3.1).

q. Asterra bears the risk of errors in fulfillment resulting in customer returns and dissatisfaction. (*Id.* at § 5).

r. Automatic renewal after a term of one (1) year, with termination rights for each party (i) if the other party has breached any material provision and that breach continues unremedied for thirty (30) days after written notice of the breach; (ii) if a party "becomes the subject of bankruptcy, insolvency, receivership, or other similar proceedings[;]" (iii) if a Change in Control (as therein defined) occurs; or (iv) if one party provides notice at least thirty (30) days prior to the expiration of the then-current term. (*Id.* at § 18).

s. Each party is subject to a non-disclosure and non-circumvention provision, as follows:

> 10. **Confidentiality and Circumvention.** Each Party hereto agrees with the other that, it and its representatives will hold in strict confidence all data and information obtained with respect to another Party or any subsidiary thereof from any representative, officer, director or employee, of such other Party, and shall not use such data or information or disclose the same to others, except to the extent such data or information is published, is a matter of public knowledge, or is required by law to be published. In the event of the termination of this Agreement, each Party shall return to the other Party all documents and other materials obtained by it or on its behalf and shall destroy all copies or other materials relating thereto. To the extent that a Party is required to disclose information by applicable law or a court of competent jurisdiction, it shall not make any such disclosure without first notifying the other Party and allowing the other Party a reasonable opportunity to seek injunctive relief from (or a protective order with respect to) the obligation to make such disclosure. Additionally, the Parties agree and acknowledge an affirmative obligation to the other Party to keep the terms and conditions of this Agreement confidential.

> 10.1 For the avoidance of confusion, the Parties agree not to circumvent one another's rights and duties to fulfill its obligations under this Agreement. Further, Supplier agrees not to circumvent Purchaser's exclusive rights under this Agreement to distribute the Products. Finally, Supplier agrees to not knowingly sell the Products to any of Purchaser's Customers.

(*Id.* at § 10).

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

27.     While MC Botanicals was aware that Asterra had not yet successfully launched in the national cannabinoid product market, a commercial relationship with Asterra was nonetheless of interest on account of Rise Capital's considerable financial backing of Asterra, including the ability to increase funding for product acquisition as would be required for scaling of the contemplated Asterra-MC Botanicals commercial relationship.

28.     MC Botanicals reasonably relied on Asterra's representations that they would be able, among other things, to provide funding and basic product inventory management and fulfillment services in the new relationship.

29.     But for these representations, MC Botanicals would never have been entered into the Manufacturing and Distribution Contract.

30.     Based on verbal agreements and confirmatory writings, the parties started performing the Manufacturing and Distribution Agreement in February 2025. The Manufacturing and Distribution Agreement was executed formally on May 2, 2025.

<u>Asterra Fails to Fulfill Its Obligations, and MC Moves to Cover at Its Own Expense</u>

31.     Within weeks of entering into the Manufacturing and Distribution Agreement, it was clear to MC Botanicals that Asterra was in breach of its performance obligations.

32.     Among other things, Asterra:

    a.  Failed to timely fund and fulfill Purchase Orders.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

b. Failed to maintain and produce accurate records of MC Botanicals Inventory. Repeated requests were made for accurate counts of MC Botanicals Inventory, and in each instance, Asterra's remedial efforts to provide accurate counts were unsuccessful.

c. Upon and information and belief, lost MC Botanicals Inventory.

d. Shipped more MC Botanicals Inventory to manufacturers then was called for by Purchase Orders.

e. Repeatedly issued erroneous Asterra Invoices overcharging MC Botanicals (specifically, charging fees up front at the time of MC Botanicals' Inventory financing, rather than at the time of MC Botanicals' Inventory fulfillment).

f. Failed to perform other normal and customary product fulfillment services, including, without limitation, inventory intake, packaging, and quality control.

33. MC Botanicals provided Asterra with timely notice of each of these breaches.

34. To salvage the relationship, MC quickly moved to cover for Asterra's performance failures under the Manufacturing and Distribution Agreement.

35. Beginning in February 2025, MC Nutraceuticals sent its then Senior Account Manager, Mr. McConnell, to North Carolina to embed with Asterra and salvage Asterra's product fulfillment program.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

36.     What was estimated to be a stint of a week or two in North Carolina for Mr. McConnell turned into months, given the number and extent of the issues that came to light regarding Asterra's fulfillment capacities. MC's expectation was that Asterra would reimburse MC Nutraceuticals for Mr. McConnell's compensation and travel expenses, given that Asterra was relying heavily on Mr. McConnell to perform Asterra's duties under the Manufacturing and Distribution Agreement.

37.     Indeed, during this period, every time Mr. McConnell tried to return to work at MC Nutraceuticals, new issues at Asterra would arise, and Mr. McConnell would be sent back to North Carolina for triage.

38.     Ultimately, Asterra requested that Mr. McConnell stay in North Carolina to manage their operations; MC agreed, with the expectation that Asterra would reimburse MC Nutraceuticals for the months Mr. McConnell had traveled back and forth to North Carolina to assist Asterra in the performance of its duties. During these weeks that turned into months, Mr. McConnell remained on MC Nutraceuticals' payroll.

39.     Mr. McConnell's presence was not enough, however to cover fully for Asterra's breaches. MC also sent Nick Pavlicek ("Mr. Pavlicek"), its contract manufacturing lead, to North Carolina to, among other things, assist with the accounting of MC Botanicals Inventory that Asterra had proven unable or unwilling to do correctly as required by the Manufacturing and Distribution Agreement.

40.     While in North Carolina, Mr. Pavlicek also flagged for MC for the first time that Asterra would not be able to manufacture and market finished goods at

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

scale, the contemplated next step in the MC-Asterra relationship. Among other things, Asterra was unable to produce finished goods at a price that would allow the company to sell to larger customers at competitive price points.

41.     Over the course of months, MC personnel in North Carolina completed intake, reconciled accounting, and managed quality control for MC Botanicals Inventory and trained Asterra's staff, all at considerable and unanticipated cost and expense to MC.

42.     In short, MC discovered countless issues with Asterra's inventory practices and quality control. Every issue representing a breach of the Manufacturing and Distribution Agreement was timely noticed to Asterra.

43.     During this period, subject to and relying on the non-disclosure and non-circumvention provisions of the Manufacturing and Distribution Agreement, MC Botanicals provided Asterra access to its Microsoft Business Central Enterprise Resource Planning ("ERP") system for accounting, inventory and shipment tracking. The confidential and proprietary MC Botanicals information provided to Asterra through the ERP system included the following:

a. Customer lists for MC Botanicals, providing, among other things:

    i.      Names and contact information;

    ii.     Pricing information;

    iii.    Product preferences;

    iv.     Product specifications, including, without limitation, chemical compositions;

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

     v.     Payment terms;

     vi.    Transaction margins;

     vii.   Purchase frequency; and

     viii.  Relationship history and notes.

b. Vendor lists for MC Botanicals, providing, among other things,

     i.      Names and contact information;

     ii.     Pricing information;

     iii.    SKUs purchased;

     iv.    Vendor-customer fit analyses;

     v.     Multi-jurisdictional regulatory compliance and harmonization analyses;

     vi.    Payment terms;

     vii.   Transaction margins;

     viii.  Purchase frequency; and

     ix.    Relationship history and notes.

44.    The information provided to Asterra through the ERP system was limited to MC Botanicals information. The information provided did *not* include any general ledger information, financial statements, regulatory strategy, or customer or vendor profiles for MC Nutraceuticals, though Mr. McConnell did have access to that information as well throughout this period by virtue of his senior role at MC Nutraceuticals.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

45. During this period, Asterra made numerous agreements with MC Botanicals regarding what Asterra, for its part, would do to correct its operations failures, but Asterra breached those agreements as quickly as it made them.

46. During this period, Rise Capital would interject itself to act as chief negotiator on behalf of Asterra in operations discussions, and in protracted negotiations regarding funding and pricing with MC Botanicals. Rise Capital would then suddenly withdraw from discussions, back away from negotiated terms, and defer to Asterra personnel, whipsawing MC Botanicals.

47. Upon information and belief, and as set forth further in the allegations to follow, Defendants' conduct throughout the Asterra bailout negotiations was in bad faith. Defendants had no intention of compensating MC for its efforts to cover for Asterra's defaults under the Manufacturing and Distribution Agreement. Instead, on information and belief, Defendants were simply buying time, continuing to use MC to build Defendants' business, with the end goal of taking what they could from MC and driving MC out of the State.

<u>With MC's Intervention and Oversight, Asterra's Revenues Skyrocket, and MC and Asterra Discuss the Next Phase of Their Commercial Relationship</u>

48. Thanks to the assistance of MC personnel and MC's herculean efforts to cover for Asterra's deficiencies at MC's expense, Asterra's revenues doubled.

49. Asterra told MC that the first months of MC at the yoke of Asterra's operations were Asterra's best months ever.

50. In other words, thanks to MC, Asterra found industry footing, finally, after five years of operating as a failing enterprise.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

51.     MC Botanicals, for its part and despite all it had had to do to cover for Asterra's deficiencies, still considered continuing business with Asterra an attractive prospect on account of Rise Capital's powerful financial backing and inventory financing capabilities.

52.     Accordingly, MC Botanicals, Rise Capital, and Asterra engaged in numerous discussions about possible mergers and roll-ups to combine MC's industry knowledge, national and international network, and regulatory support services with Asterra's financing capabilities through Rise Capital.

53.     During these discussions, MC personnel in and outside of North Carolina continued to cover for Asterra's many operational deficiencies.

54.     Upon information and belief, however, even as these discussions progressed, Defendants were conspiring to take what they could from MC, including trade secrets, personnel, and inventory, and drive MC out of North Carolina to establish Defendants' desired position as captains of the North Carolina cannabinoid industry.

<u>Defendants, Capitalizing on Cannabinoid Market Disruption in May 2025, Make Their Play Against MC</u>

55.     In the second fiscal quarter of 2025, threatened regulatory changes in the Texas cannabinoid market contributed to a high degree of national market turbulence.

56.     This market turbulence caused an average reduction in national hemp revenue of 40%, which lasted until the Governor of Texas vetoed the proposed regulatory changes, thanks in part to the advocacy of MC Botanicals officers and

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

other industry lobbyists. The market remains in turmoil even today, as the Governor's veto has sent the regulatory changes back to a legislative committee.

57.     This market turbulence contributed to an acute, temporary disruption of MC's financing systems and cash flow.

58.     On information and belief, Asterra and Rise Capital saw their opportunity to make a play against MC.

59.     Over Memorial Day Weekend 2025, MC Botanicals, because of MC's cash flow disruption, was a few days late on making payment of Asterra Invoices.

60.     Operating in good faith, MC Botanicals, going into Memorial Day Weekend, notified Asterra and Rise Capital that it would likely be late in paying Asterra Invoices in question because of MC's acute, temporary cash flow disruption.

61.     Asterra and Rise Capital provided assurances that they would continue to perform their obligations during MC Botanicals' temporary delay in payment of Asterra Invoices.

62.     On June 5, 2025, however, just days after the Asterra Invoices in question came due, Rise Capital told MC Botanicals—inconsistent with the prior assurances—that Asterra would not be performing its obligations under the Manufacturing and Distribution Agreement or taking any further corrective measures related to defaults in its prior contractual performance.

63.     In other words, Rise Capital used the minor and temporary payment delays as an excuse to cause Asterra to completely repudiate the Manufacturing and Distribution Agreement.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

64. Defendants did not ask MC Botanicals for further assurances that it could perform its contractual obligations of making payments on the Asterra Invoices with late-payment interest as contemplated by Section 3 of the Manufacturing and Distribution Agreement, nor did they provide MC Botanicals any 30-day cure period, as would have been required if in fact MC Botanicals' days-long default in payment of Asterra Invoices was a material default, which MC Botanicals denies.

65. In fact, while MC Botanicals repeatedly told Defendants that it would be able to pay the Asterra Invoices relatively promptly, and that MC's cash flow issue was temporary, Defendants made it clear that they would *not* accept late payment with interest, as contemplated by Sections 3 and 9 of the Manufacturing and Distribution Agreement.

66. Instead, Rise Capital and Asterra demanded that MC Botanicals pay $50,000 a day if MC Botanicals wanted Asterra to perform its contractual obligations.

67. Rise Capital and Asterra further refused to credit MC Botanicals the estimated $100,000 to $150,000 worth of MC Botanicals Inventory missing from Asterra's possession as an offset to their demands for payment.

68. MC was taken by surprise by Asterra's total repudiation of its contractual obligations after only a few days' delinquency in MC Botanicals' payment obligations, and after months of MC Botanicals covering for Asterra's multiple failures to perform its obligations. Indeed, only the week before, MC Botanicals had been in intensive merger and roll-up discussions with Asterra and Rise Capital.

<u>Defendants Poach Mr. McConnell to Exploit His Access to MC's Trade Secrets and Confidential and Proprietary Information</u>

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

69.     At the same time Rise Capital told MC Botanicals that it had caused

Asterra to repudiate the Manufacturing and Distribution Agreement, Mr. McConnell,

who was still in North Carolina with Asterra providing operational support, suddenly

provided notice to MC Nutraceuticals that he was resigning from MC Nutraceuticals.

A copy of Mr. McConnell's notice to MC Nutraceuticals is attached hereto as Exhibit

B and incorporated by reference herein.

70.     Upon information and belief, as part of their play against MC, Asterra

and Rise Capital had approached Mr. McConnell about leaving MC Nutraceuticals to

join Asterra permanently and to lead the company's sales efforts. Asterra and Rise

Capital understood how essential Mr. McConnell could be in helping them essentially

take MC's business for themselves, and that Mr. McConnell had access to MC's

valuable trade secrets and confidential and proprietary information.

71.     Indeed, having risen to Senior Director of Sales for MC Nutraceuticals,

Mr. McConnell had almost complete access to MC's sensitive, confidential,

proprietary information related to the cannabinoid industry. This information

included, without limitation:

a.   Customer lists for MC Nutraceuticals and MC Botanicals, providing, among

other things:

i.      Names and contact information;

ii.     Pricing information;

iii.    Product preferences;

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

iv.    Product specifications, including, without limitation, chemical compositions, skew information; potency information;

v.    Manufacturing formulas and manufacturing practices for customer-specific cannabinoid blends, including concentration preferences for HHC; THCA isolate; Delta 8; Delta 9; CBD; CBC; CGB; and CBN and their respective variates;

vi.    Payment terms;

vii.    Transaction margins;

viii.    Purchase frequency; and

ix.    Relationship history and notes.

b.    Vendor lists for MC Nutraceuticals and MC Botanicals, providing, among other things:

i.    Names and contact information;

ii.    Pricing information;

iii.    Skews purchased;

iv.    Vendor-customer fit analyses;

v.    Multi-jurisdictional regulatory compliance and harmonization analyses;

vi.    Payment terms;

vii.    Transaction margins;

viii.    Purchase frequency; and

ix.    Relationship history and notes;

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

c.  General ledgers and MC financial reports;

d.  All intercompany activity for MC Botanicals; and

e.  Global Regulatory and lobbying strategy documents for MC Nutraceuticals and MC Botanicals.

72.    Mr. McConnell was bound by valid, enforceable post-employment restrictive covenants. For good and valuable consideration, he had previously entered into a Mutual Confidentiality Agreement with MC Nutraceuticals, effective April 17, 2023 (the "McConnell Employment Agreement"). A true and correct copy of the McConnell Employment Agreement is attached hereto as <u>Exhibit C</u> and incorporated by reference herein.

73.    The McConnell Employment Agreement contains non-disclosure and non-solicitation provisions lasting for one (1) year following Mr. McConnell's termination or resignation from MC Nutraceuticals.

74.    With respect to confidentiality and non-disclosure, the McConnell Employment Agreement provides as follows:

[Paragraph allegations continue on the following page]

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

## 1. DISCLOSURE OF CONFIDENTIAL INFORMATION

As used in this Agreement, "Confidential Information" includes any information or data disclosed by Disclosing Party to the Receiving Party and which concerns the management and business of Disclosing Party, the business relationships and affairs of the Disclosing Party and its clients, the internal policies and procedures applicable to the Disclosing Party's personnel and the formulation of marketing strategies and policies. It also includes displays, designs, descriptions, procedures, formulas, discoveries, inventions, specifications, drawings, sketches, models, samples, codes, improvements, concepts, ideas, commercial agreements and past, present and future research, development, business activities, products or services that are proprietary to the Disclosing Party or to a third party to whom the Disclosing Party has a duty of confidentiality as well as any additional information the Disclosing Party may also designate as Confidential Information either orally or in writing. Such Confidential Information is covered by this Agreement whether or not it is disclosed to Receiving Party in written form and whether or not marked "Confidential" or, disclosed orally.

## 2. CONFIDENTIALITY COVENANTS

Receiving Party agrees to accept and receive Disclosing Party's Confidential Information under a covenant of confidentiality, establishing a fiduciary relationship between Disclosing Party and Receiving Party, in regard to the Confidential Information. Furthermore, Receiving Party hereby agrees to maintain and safeguard Disclosing Party's Confidential Information in the strictest of confidence (in a manner no less stringent than the measures they use for their own Confidential Information), using Confidential Information solely and exclusively for the purpose of evaluating the commercial potential with Disclosing Party. Receiving Party will not directly or indirectly use, take advantage of, or allow anyone to use or take advantage of, the Confidential Information for their own separate interests, or to compete against the Disclosing Party in any enterprise of a comparable or similar nature. Under no circumstances shall the Receiving Party or its employees or consultants make copies of the Disclosing Party's Confidential Information or remove such Confidential Information from their business premises without written permission.

## 3. CONFIDENTIALITY COVENANTS -- EXEMPTIONS

Confidential Information shall not include information that (i) is or becomes available to the public other than by disclosure by the Receiving Party in violation of this Agreement; (ii) was demonstrably known to Receiving Party previously with no obligation to hold it in confidence; (iii) is independently developed by either party without recourse to the Confidential Information, or (iv) was rightfully obtained by either party from a third party without an obligation of confidentiality.

## 4. MATERIALS SHALL REMAIN PROPERTY OF DISCLOSING PARTY

All materials, including, without limitation, documents, displays, drawings, models, presentations, apparatus, sketches, designs and lists furnished to Receiving Party by Disclosing Party in furtherance of this Agreement shall remain the property of Disclosing Party. Upon written notice of termination from the Disclosing Party, the Receiving Party shall, as requested by the Disclosing Party, immediately return all Confidential Information to Disclosing Party or destroy such materials and all copies thereof. This Agreement does not grant Receiving Party any license to use Disclosing Party's Confidential Information

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

75.     With respect to non-solicitation, the McConnell Employment Agreement provides that Mr. McConnell may not directly or indirectly solicit MC customers.

76.     Upon information and belief, Asterra and Rise Capital knew or should have known of the McConnell Employment Agreement and that Mr. McConnell was subject to restrictive covenants similar to those contained in Section 10 of the Manufacturing and Distribution Agreement, which prohibited him from sharing confidential or proprietary information or trade secrets and from soliciting MC customers. Despite this knowledge, Asterra and Rise Capital procured Mr. McConnell's breach of his obligations under the McConnell Employment Agreement and have since approached other senior MC employees about leaving, in direct violation of their similar agreements with MC.

77.     Asterra and Rise Capital have already benefited from Mr. McConnell's access to MC Nutraceuticals trade secrets and proprietary and confidential information, access to which they were never entitled, and from Mr. McConnell's access to MC Botanicals trade secrets and proprietary and confidential information, access to which they were only selectively entitled. Indeed, based on MC's preliminary investigation and Defendants' recent statements, Defendants are currently using MC Nutraceuticals' customer lists to solicit business, and further using the financial information and regulatory strategy information of MC Nutraceuticals and MC Botanicals as leverage in this dispute. Among other things, evidence show that:

a. Asterra is using MC Botanicals and MC Nutraceuticals customer and vendor lists to solicit vendors and customers.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

b. Mr. McConnell, as an agent for Asterra, has solicited business from Golden Hour Hemp, an MC Customer, in violation of the non-solicitation provisions of the McConnell Employment Agreement and of Asterra's non-circumvention obligations under the Manufacturing and Distribution Agreement.

c. Asterra and Rise Capital are attempting to use highly confidential MC Botanicals and MC Nutraceuticals financial information and regulatory strategy information to coerce MC to capitulate to its demands for $50,000 a day..

d. Mr. McConnell, as an agent for Asterra, has solicited business from Golden Hour Hemp, an MC Customer, in violation of the McConnell Employment Agreement and of Asterra's obligations under the Manufacturing and Distribution Agreement.

78. MC Nutraceuticals has been irreparably harmed, and will face further irreparable harm, absent an injunction of Mr. McConnell's breaches of the Employment Agreement and Asterra's breaches of the non-disclosure and non-circumvention provisions of the Manufacturing and Distribution Agreement, prohibiting Defendants from accessing or using further MC's confidential and proprietary information and trade secrets in Defendants' possession.

<u>Defendants Take the MC Botanicals Inventory for Themselves</u>

79. At the same time Defendants were repudiating the Manufacturing and Distribution Agreement and procuring Mr. McConnell's breaches of his Employment

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

Agreement, they also were converting the MC Botanicals Inventory, title to which belonged to MC Botanicals pursuant to the Manufacturing and Distribution Agreement, for themselves.

80. While refusing to account for the MC Botanicals Inventory in their possession, Defendants made it clear that they would not release any MC Botanicals Inventory to MC Botanicals, or even recognize MC Botanicals' interest in the MC Botanicals Inventory, until MC Botanicals capitulated to Defendants' demands.

81. Defendants even began attempting to sell away the MC Botanicals Inventory for their exclusive benefit, in violation of the Manufacturing and Distribution Agreement and applicable law. Upon information and belief, Defendants have been successful in selling at least some of the MC Botanicals Inventory.

82. These efforts were crude, and, upon information and belief, included Rep. John Bell, Asterra's President, attempting to sell MC Botanicals Inventory on LinkedIn:

[Paragraph allegations continue on the following page]

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603



Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

83.     MC Botanicals has made repeated demands that Defendants account for and return the MC Botanicals Inventory, which demands Defendants have to date rejected.

<u>Defendants Threaten to Use Their Powerful North Carolina Networks to Have The Worleys Prosecuted and Thrown In Jail if MC Refuses to Capitulate to Defendants' Demands</u>

84.     Defendants did not stop there. In the weeks leading up to the filing of the instant lawsuit, Defendants, including through direct communications from Rise Capital President Harry Smith, threatened to use Defendants' powerful North Carolina networks to have MC's principals investigated, prosecuted, and thrown in jail if they did not immediately capitulate to Defendants' demands for payment, release from any contractual obligations, and title to the MC Botanicals Inventory.

85.     The following is but a sampling of the threats from Harry Smith, on behalf of Rise Capital and Asterra, sent via text to Jeff Worley:


[Paragraph allegations continue on the following page]

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603


Mon, Jun 16 at 14:47

i'm going to put you and your son in jail - hitting private investigators and opposition research teams today.  You buckle up Jeff - I will see you and your unstable son in a court room.  It's all principle to me - right versus wrong - you guys are absolute frauds.  You picked the wrong guy and the wrong company to try and steal from.  Buckle up / see you in depositions

hiring

Tue, Jun 24 at 06:16

we have more than enough to get BOTH of you criminally charged and we are going to do that - pay us or go to prison right here in the great state of NC Jeff - no reply needed.

Today 07:15

Jeff - I'm beyond confidant that you both get convicted of a felony(s)  and I'm beyond convinced we will be able to come after you both personally on the civil side.  Pay your bills or I can't help you - once the civil and criminal investigation begins there is no stopping it.  Spending 10 years in prison in NC isn't a great retirement plan

iMessage

86.    In an email dated July 2, 2025 from Defendants' counsel, Defendants reiterated these threats to cause law enforcement to prosecute the Worleys if MC refused to capitulate to Defendants' demands. A copy of this correspondence is attached hereto as <u>Exhibit D</u> and incorporated by reference herein.

87.    Defendants also sent so-called evidence preservation letters to a number of personal and professional associates of Bret and Jeff Worley repeating Defendants' same baseless claims against the Worleys in an attempt to further intimidate the Worleys into capitulating to Defendants' unlawful demands.

88.    Defendants' threats are baseless and improper and constitute substantial aggravating circumstances, subjecting Defendants to extra-contractual liability as set forth herein.

89.    MC refuses to capitulate to these improper demands, and brings the instant lawsuit seeking damages and immediate injunctive relief.

## CAUSES OF ACTION

<u>Count One – Breach of Contract</u>
*(Against Asterra for Its Breaches of the Manufacturing and Distribution Agreement)*

90.    The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

91.    The Manufacturing and Distribution Agreement is a valid and enforceable contract between MC Botanicals and Asterra.

92.    MC Botanicals has substantially complied with its material duties and obligations under the Manufacturing and Distribution Agreement, including going above and beyond its duties and obligations to attempt to cover for Asterra's

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

numerous breaches, and has satisfied all conditions precedent to recovering the relief sought in this action.

93. Asterra has materially breached its express and implied contractual obligations to MC Botanicals under the Manufacturing Distribution Agreement as set forth herein and as may be shown at trial, including, without limitation, by:

a. Failing to timely finance and fulfill MC Botanicals Purchase Orders;

b. Failing to maintain and produce accurate records of MC Botanicals Inventory;

c. Losing MC Botanicals Inventory;

d. Improperly selling away MC Botanicals Inventory;

e. Issuing erroneous Asterra Invoices overcharging MC Botanicals;

f. Failing to perform other normal and customary product fulfillment services, including, without limitation, inventory intake, packaging, and quality control;

g. Refusing to compensate or reimburse MC for MC's efforts to cover for Asterra's ongoing failures to perform its contractual obligations;

h. Violating its non-disclosure and non-circumvention provisions; and

i. Failing to provide MC Botanicals a 30-day period to cure payment defaults, if and to the extent those defaults were material;

j. Soliciting business from Golden Hour Hemp in violation of the non-circumvention obligations under the Manufacturing and Distribution Agreement; and

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

k. Unlawfully repudiating and terminating the Manufacturing and Distribution Agreement;

94.     MC Botanicals has suffered and continues to suffer damages, in an amount to be proved at trial as a direct and proximate cause of Asterra's breaches of its obligations under the Manufacturing and Distribution Agreement.

Count Two – Breach of Contract
*(Against Mr. McConnell for His Breaches of His Employment Agreement)*

95.     The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

96.     The McConnell Employment Agreement is a valid and enforceable contract between MC Nutraceuticals and Mr. McConnell.

97.     MC Nutraceuticals has complied with its duties and obligations under the McConnell Employment Agreement, and has satisfied all conditions precedent to recovering the relief sought in this action.

98.     Mr. McConnell has materially breached his express and implied contractual obligations to MC Nutraceuticals under the McConnell Employment Agreement as set forth herein and as may be shown at trial, including, without limitation, by directly and indirectly soliciting MC customers, including Golden Hour Hemp, an MC customer, on Asterra's behalf, and by misappropriating the following information:

a. Customer lists for MC Nutraceuticals and MC Botanicals, providing, among other things:

i.     Names and contact information;

32

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

ii.    Pricing information;

iii.    Product preferences;

iv.    Product specifications, including, without limitation, chemical compositions, skew information; potency information;

v.    Manufacturing formulas and manufacturing practices for customer-specific cannabinoid blends, including concentration preferences for HHC; THCA isolate; Delta 8; Delta 9; CBD; CBC; CGB; and CBN and their respective variates;

vi.    Payment terms;

vii.    Transaction margins;

viii.    Purchase frequency; and

ix.    Relationship history and notes.

b.  Vendor lists for MC Nutraceuticals and MC Botanicals, providing, among other things:

i.    Names and contact information;

ii.    Pricing information;

iii.    Skews purchased;

iv.    Vendor-customer fit analyses;

v.    Multi-jurisdictional regulatory compliance and harmonization analyses;

vi.    Payment terms;

vii.    Transaction margins;

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

viii.   Purchase frequency; and

ix.   Relationship history and notes;

c. General ledgers and MC financial reports;

d. Global Regulatory and lobbying strategy documents for MC Nutraceuticals and MC Botanicals.

99.   MC Nutraceuticals has suffered and continues to suffer damages, in an amount to be proved at trial as a direct and proximate cause of Mr. McConnell's breaches of his obligations under the McConnell Employment Agreement.

<u>Count Three – Breach of Implied Duty of Good Faith and Fair Dealing</u>
*(Against Asterra and Mr. McConnell for Breaches of their Respective Agreements)*

100.   The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

101.   Asterra and Mr. McConnell had implied duties of good faith and fair dealing with MC Botanicals and MC Nutraceuticals, respectively, in connection with the performance of the Manufacturing and Distribution Agreement and the McConnell Employment Agreement, respectively.

102.   Asterra and Mr. McConnell have breached their duties of good faith and fair dealing as set forth herein and as will be shown at trial.

103.   Plaintiffs have suffered and continued to suffer damages, in amount to be provided at trial as a direct and proximate cause of Asterra and Mr. McConnell's breaches of their implied duties of good faith and fair dealing.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

<u>Count Four – Unjust Enrichment</u>
*(Against Asterra and Mr. McConnell, in the Alternative)*

104. The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

105. Asterra holds money and property that in equity and good conscience belongs to MC Botanicals

106. Mr. McConnell holds money and property that in equity and good conscience belongs to MC Nutraceuticals,.

107. Asterra and Mr. McConnell would be unjustly enriched if permitted to retain the benefit of the wrongfully held money and property.

108. Asterra and Mr. McConnell have been unjustly enriched to Plaintiffs' detriment in an amount to be proved at trial as a direct and proximate cause of Asterra and Mr. McConnell's unlawful actions.

<u>Count Five – Tortious Interference with Contract and/or Prospective Economic Advantage</u>
*(Against Rise Capital)*

109. The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

110. The Manufacturing and Distribution Agreement is a valid agreement between MC Botanicals and Asterra.

111. Rise Capital is not a party to the Distribution Agreement, but is fully aware of its terms.

112. Rise Capital has taken actions to prevent Asterra from performing its obligations under the Distribution Agreement, in an effort to gain personal advantage

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

and/or to impair the contractual rights and prospective economic advantage of MC Botanicals.

113.    Rise Capital acted without justification in procuring Asterra's breaches of these agreements because its motives were not reasonably related to the protection of a legitimate business interest, but rather were based on malice.

114.    MC Botanicals has been damaged by the tortious actions of Rise Capital, as set forth herein and as will be further shown at trial, in an amount to be determined.

115.    The above-described conduct also justifies the imposition of punitive damages under applicable law.

<u>Count Six – Tortious Interference with Contract and/or Prospective Economic Advantage</u>
*(Against Rise Capital and Asterra)*

116.    The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

117.    The McConnell Employment Agreement is a valid agreement between MC Nutraceuticals and Mr. McConnell.

118.    Rise Capital and Asterra are not parties to the McConnell Employment Agreement, but, upon information and belief, are fully aware or should have been aware of its terms. Upon information and belief Rise Capital and Asterra have benefitted from Mr. McConnell's access to MC trade secrets and proprietary and confidential information, including, without limitation, customer and inventory lists

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

and MC financial records, in direct violation of the McConnell Employment Agreement.

119.    Rise Capital has taken actions to prevent Asterra from performing its obligations under the Distribution Agreement, in an effort to gain personal advantage and/or to impair the contractual rights and prospective economic advantage of MC Botanicals.

120.    Rise Capital acted without justification in procuring Asterra's breaches of these agreements because its motives were not reasonably related to the protection of a legitimate business interest, but rather were based on malice.

121.    MC Botanicals has been damaged by the tortious actions of Rise Capital, as set forth herein and as will be further shown at trial, in an amount to be determined.

122.    The above-described conduct also justifies the imposition of punitive damages under applicable law.

<u>Count Seven – State Misappropriation of Trade Secrets</u>

123.    The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

124.    Plaintiffs are the owners of certain trade secrets and proprietary information (collectively, "Trade Secrets"), including, without limitation:

a.    Customer lists providing, among other things:

i.    Names and contact information;

ii.    Pricing information;

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

      iii.    Product preferences;

      iv.    Product specifications, including, without limitation, chemical compositions, skew information; potency information;

      v.    Manufacturing formulas and manufacturing practices for customer-specific cannabinoid blends, including concentration preferences for HHC; THCA isolate; Delta 8; Delta 9; CBD; CBC; CGB; and CBN and their respective variates;

      vi.    Payment terms;

      vii.    Transaction margins;

      viii.    Purchase frequency; and

      ix.    Relationship history and notes.

b.  Vendor lists providing, among other things:

      i.    Names and contact information;

      ii.    Pricing information;

      iii.    Skews purchased;

      iv.    Vendor-customer fit analyses;

      v.    Multi-jurisdictional regulatory compliance and harmonization analyses;

      vi.    Payment terms;

      vii.    Transaction margins;

      viii.    Purchase frequency; and

      ix.    Relationship history and notes;

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

c. General ledgers and financial reports;

d. Regulatory and lobbying strategy documents.

125. The Trade Secrets constitute business and technical information deriving independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use.

126. Defendants knew or should have known of the Trade Secrets.

127. The Trade Secrets are not known or made available to the public, nor are they readily ascertainable through independent development.

128. Plaintiffs take reasonable measures to protect the Trade Secrets from disclosure, including but not limited to:

a. Instituting and enforcing security measures to protect data through logins and passwords;

b. Requiring non-disclosure agreements, such as the agreements in the McConnell Employment Agreement and Manufacturing and Distribution Agreement, to protect Trade Secrets from disclosure;

c. Instituting and enforcing appropriate policies concerning Trade Secrets;

d. Training/warning employees and contractors with regard to protection of Trade Secrets; and

e. Appropriately marking documents containing Trade Secrets as "Confidential" and/or "Proprietary."

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

129.   Asterra and Mr. McConnell had specific opportunities to acquire the Trade Secrets during their business and contractual relationships with Plaintiffs in which Plaintiffs entrusted Asterra and Mr. McConnell with copies of and/or access to Trade Secret information in furtherance of the contractual relationships of the parties and the various written agreements between and among the parties.

130.   Asterra and Mr. McConnell did in fact acquire and use the Trade Secrets for their own and separate benefit without Plaintiffs' express or implied consent or authority, and thereby misappropriated Plaintiffs' trade secrets within the meaning of N.C. Gen. Stat. Section 66-152 *et seq.*

131.   Plaintiffs upon motion are entitled to a temporary restraining order and preliminary injunction against the continued misappropriation and misuse of the Trade Secrets pursuant to N.C. Gen Stat. Section 66-154(a).

132.   Because the actions of Asterra and Mr. McConnell have and will cause irreparable injury to Plaintiffs, Plaintiffs upon motion are entitled to have Defendants' misappropriation, disclosure, and use of the Trade Secrets enjoined by this Court, and all such Trade Secrets, in tangible form, returned to MC Nutraceuticals and MC Botanicals, as applicable, and all documents and things created from the Trade Secrets destroyed.

133.   Plaintiffs have suffered actual damages proximately caused by Asterra and Mr. McConnell's misappropriation of the Trade Secrets in an amount to be proven at trial pursuant to N.C. Gen. Stat. Section 66-154(b).

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

134.    Asterra and Mr. McConnell's misappropriation of Trade Secrets was willful and wanton, and Plaintiffs are entitled to recover punitive damages from Asterra and Mr. McConnell, accordingly, pursuant to N.C. Gen. Stat. Section 66-154(c).

135.    Asterra and Mr. McConnell's misappropriation of Trade Secrets was also in bad faith, and Plaintiffs are therefore entitled to recover attorneys' fees from Defendants' pursuant to N.C. Gen. Stat. Section 66-154(d).

## Count Eight – Federal Misappropriation of Trade Secrets

136.    The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

137.    The Trade Secrets are related to products and services intended for interstate commerce and meet the definition of "trade secret" under 18 U.S.C. Section 1839(3).

138.    The conduct of Asterra and Mr. McConnell, as alleged herein, constitutes misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. Section 1836(b).

139.    The conduct of Asterra and Mr. McConnell, as alleged herein, has caused and will continue to cause damage to MC Botanicals and MC Nutraceuticals, respectively, for which each is entitled to recover in an amount to be proven at trial.

140.    The conduct of Asterra and Mr. McConnell is knowing, willful, malicious, and in reckless disregard of the rights of MC Botanicals and MC Nutraceuticals' rights, respectively. Accordingly, each of MC Botanicals and MC

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

Nutraceuticals is entitled to recover from Asterra and Mr. McConnell, respectively, exemplary damages of up to two times its actual damages, plus attorneys' fees, pursuant to 18 U.S.C. Section 1836(b)(3) and other applicable law.

141.   In addition to its recovery of monetary damages, and because the actions of Asterra and Mr. McConnell have and will cause irreparable harm to MC Botanicals and MC Nutraceuticals, respectively, each of MC Botanicals and MC Nutraceuticals is entitled to have Asterra and Mr. McConnell's respective misappropriation, disclosure, and use of the Trade Secrets enjoined by this Court upon motion, and all such Trade Secrets, in tangible form, returned to MC Botanicals and MC Nutraceuticals, respectively, and all documents and things created from the Trade Secrets destroyed.

Count Ten – Unfair and Deceptive Trade Practices
*(Against All Defendants)*

142.   The allegations contained in the prior paragraphs are hereby re-alleged and incorporated by reference as if set forth verbatim herein.

143.   Defendants' actions were, in whole or in part, in and affecting commerce.

144.   Defendants' actions, as set forth above and as may be proved at trial of this action, violate Chapter 75 of the North Carolina General Statutes, as they constitute unfair and deceptive trade practices.

145.   Defendants agreed and conspired to carry out the actions in question, and at all pertinent times, Defendants acted on behalf of themselves and one another.

146.   As a direct and proximate result of these unfair, deceptive, and unlawful acts, MC Botanicals has suffered damages in an amount to be proved at trial.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

147. Defendants have willfully engaged in the acts or practices alleged herein, and there has been an unwarranted refusal by Defendants to fully resolve the matter which constitutes the basis of this suit.

148. Defendants conduct, including, without limitation, their baseless and improper threats against Plaintiffs' principals, constitute substantial aggravating circumstances.

149. Pursuant to N.C. Gen. Stat. § 75-1.1 *et seq.*, MC Botanicals is entitled to recover from Defendants costs and attorneys' fees in connection with this action, as well as treble damages.

## RELIEF REQUESTED

Plaintiffs respectfully asks this Court to award it the following relief:

1. That the Court grant Plaintiffs' to-be-filed motion for a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure and enjoin Mr. McConnell, his agents, and those persons in active concert or participation with him who have actual notice of the order, upon motion, from engaging in the following restricted acts in violation of the covenants contained in the McConnell Employment Agreement, including, without limitation, (a) soliciting, directly or indirectly, MC customers; and (b) misappropriating MC's Trade Secrets and confidential and proprietary information.

2. In aid of Plaintiffs' preliminary injunction proceedings, that the Court allow Plaintiffs to seek expedited discovery regarding Mr. McConnell's

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

activities for and on behalf of Asterra and/or Rise Capital, as well as his access to and use of Trade Secrets and other confidential and proprietary information of Plaintiffs.

3.     Preliminarily and permanently restrain and enjoin (a) Mr. McConnell; (b) his agents; and (c) those persons in active concert or participation with him who have actual notice of the order from further violations of the restrictive covenants contained in the McConnell Employment Agreement during the pendency of this action or the expiration of the respective covenants (as tolled), whichever is shorter.

4.     That the Court further enjoin Asterra, its agents, and those persons in active concert or participation with it who have actual notice of the order from engaging in the following restricted acts in violation of the covenants contained in the Manufacturing and Distribution Agreement, including, without limitation, (a) soliciting, directly or indirectly, MC customers; and (b) misappropriating MC's Trade Secrets and confidential and proprietary information.

5.     In aid of Plaintiffs' preliminary injunction proceedings, that the Court allow Plaintiffs to seek expedited discovery regarding Asterra's activities in violation of the Manufacturing and Distribution Agreement, as well as its access to and use of Trade Secrets and other confidential and proprietary information of Plaintiffs.

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

6. Preliminarily and permanently restrain and enjoin (a) Asterra; (b) its agents; and (c) those persons in active concert or participation with Asterra who have actual notice of the order from further violations of the restrictive covenants contained in the Manufacturing and Distribution Agreement during the pendency of this action or the expiration of the respective covenants (as tolled), whichever is shorter.

7. That the Court further enjoin all Defendants from using, distributing, publishing, and/or failing to protect Plaintiffs' respective Trade Secrets and confidential and proprietary information;

8. That Plaintiffs recover all compensatory and statutory damages to which they are entitled against Defendants;

9. That the Court order Defendants, jointly and severally, to pay Plaintiffs treble damages, punitive damages, and/or exemplary damages as a result of Defendants' unfair and deceptive trade practices and other intentional misconduct, to the fullest extent allowed by law;

10. That the Court impose a constructive trust over the MC Botanicals Inventory in Asterra's possession;

11. That the Court enjoin Asterra from selling or otherwise disposing of the MC Botanicals Inventory;

12. That the costs of this action be taxed against Defendants;

13. That Plaintiffs recover reasonable attorneys' fees in connection with this action, as allowed under North Carolina law;

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

14. That Plaintiffs have a trial by jury of all issues so triable; and

15. That Plaintiffs be awarded such further and additional relief as the Court may deem just and proper.

[No further text on this page]

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

This the 7th day of July 2025.

PARRY LAW, PLLC


By:    /s/ Jonah Garson

K. Alan Parry
State Bar No. 31343
Amos Tyndall
State Bar No. 19309
Jonah Garson
State Bar. No. 55547
The Europa Center
100 Europa Drive, Suite 351
Chapel Hill, NC 27517
Phone: 919.913.3320
Fax: 919.869.2600
kap@parryfirm.com
agt@parryfirm.com
jag@parryfirm.com

**COUNSEL FOR PLAINTIFFS MC BOTANICALS, LLC AND MC NUTRACEUTICALS, LLC**

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

## VERIFICATION

Bret Worley declares under penalty of perjury the following:

I am over eighteen years of age; I have not been declared incompetent; I am a manager of MC Botanicals, LLC and MC Nutraceuticals, LLC; I am authorized to make verifications on behalf of each of MC Botanicals, LLC and MC Nutraceuticals, LLC; I have read the foregoing Verified Complaint; the Verified Complaint was prepared with the advice and assistance of counsel upon which I relied; the contents thereof are true of my own knowledge or based upon records in the possession and custody of MC Botanicals, LLC and/or MC Nutraceuticals and, therefore, within my knowledge, and as to those instances in which allegations are made upon information and belief, are true to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct.

This the 7th day of July, 2025.

MC BOTANICALS, LLC

By: _____
Name: Bret Worley
Title:  Manager

MC NUTRACEUTICALS, LLC

By: _____
Name: Bret Worley
Title:  Manager

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

# EXHIBIT A

(Attached hereto)

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

# EXHIBIT B

(Attached hereto)

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

# EXHIBIT C

(Attached hereto)

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603

# EXHIBIT D

(Attached hereto)

Doc ID: 7d2bee4b2f029b0ebc140965d41459a7a5606603


| | |
|---|---|
| **Title** | 25 07 07 Complaint (Final).pdf |
| **File name** | 25%2007%2007%20Co...20%28Final%29.pdf |
| **Document ID** | 7d2bee4b2f029b0ebc140965d41459a7a5606603 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| SENT | **07 / 07 / 2025**<br>19:25:17 UTC | Sent for signature to Bret Worley (bret@mcnutraceuticals.com) from jag@parryfirm.com<br>IP: 75.7.143.237 |
| VIEWED | **07 / 07 / 2025**<br>19:25:32 UTC | Viewed by Bret Worley (bret@mcnutraceuticals.com)<br>IP: 67.190.98.134 |
| SIGNED | **07 / 07 / 2025**<br>19:25:42 UTC | Signed by Bret Worley (bret@mcnutraceuticals.com)<br>IP: 67.190.98.134 |
| COMPLETED | **07 / 07 / 2025**<br>19:25:42 UTC | The document has been completed. |

Powered by  Dropbox Sign