# EXHIBIT A

# MANUFACTURING AND SUPPLY AGREEMENT

**THIS MANUFACTURING AND SUPPLY AGREEMENT** (this "**Agreement**") is dated as of May 2nd, 2025 ("**Effective Date**") and is made between **Asterra Labs, LLC**, a North Carolina limited liability company ("**Supplier**") having its offices at 800 Cook Road, Nashville, NC 27856 and **MC Botanicals, LLC,** a North Carolina limited liability company ("**Purchaser**") having its offices at **PO Box 1135 Argyle, TX 76226**. "**Party**" means a party to this Agreement and any reference to a Party includes its successors and permitted assigns and "**Parties**" means every Party.

**RECITALS:**

- A. Supplier is a supplier of certain materials and ingredients ("**Products**", as that term is defined herein) that can be included into cannabis-based consumer health and wellness products;

- B. Supplier desires to sell and Purchaser desires to purchase Products and Distribute on behalf of Supplier on and subject to the terms and conditions of this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Supply of Products.** Purchaser hereby agrees to purchase Products as set forth in a Purchase Order (as defined below) and associated invoice, subject to and in accordance with the terms and conditions of this Agreement.

2. **Purchase Transactions.** Purchaser shall issue purchase orders to Supplier for Product during the Term (each, a "**Purchase Order**") in accordance with Supplier's then-current policies and processes. By issuing a Purchase Order to Supplier, Purchaser makes an offer to purchase Products under the terms and conditions of this Agreement and Supplier's invoice ("**Supplier Invoice**") issued to Purchaser in relation to such Purchase Orders and on no other terms. Purchaser shall pay to Supplier purchase prices in accordance with payment details set out in Supplier Invoice.

3. **Payment.** Payment shall be due within thirty (30) days of the date of the Supplier Invoice. Purchaser shall provide payment to Supplier for each Supplier invoice via ACH, wire transfer, cash, or credit card or as set forth in a given Supplier Invoice. Purchaser shall pay interest on all late payments, calculated daily and compounded monthly, at the lesser rate of 1.5% per month or the highest rate permissible under applicable law. Notwithstanding any such Purchase Order, the terms of this Agreement and/or Supplier Invoice shall govern any purchase transactions, and Purchaser shall be deemed to accept such invoice terms upon pick-up of Products by Purchaser. Except as otherwise agreed in writing by both Parties, in the event of a conflict or inconsistency between any provision of this Agreement, any Purchase Order or Supplier Invoice, the following order of priority will apply: (i) Supplier Invoice; (ii) the terms of this Agreement; (iii) Purchase Orders.

    3.1 Notwithstanding the foregoing, the Parties agree and acknowledge that for each Unit sold by Purchaser pursuant to this Agreement, Purchaser shall compensate Supplier at a rate of fifty and no/100 dollars ($50.00) per Unit ("Unit Price"). For purposes of this Subparagraph 3.1, the term "Unit" is defined to mean a single quantity of an item. By way of example and not limitation, one (1) kilogram of delta-9 distillate shall mean one Unit, or one (1) pound of hemp flower shall mean one Unit.

    3.2 The Parties agree that the Unit Price as set forth in Subsection 3.1 shall be renegotiated between the Parties no earlier than forty-five (45) days after the mutual execution of this Agreement.

    3.3 As a condition of the payment terms above, a credit facility from Supplier shall be established for Purchaser upon the execution of this agreement in the amount of two million, five hundred thousand and no/dollars ($2,500,000.00).

4. **Transportation, Title and Risk of Loss.** Supplier shall be responsible for all shipping and/or delivery expenses to its facility. With the exception of Product Samples, which shall be borne exclusively by Purchasers, Supplier shall be responsible for the cost of shipping expenses to Purchaser's customers. Title to Products and risk of loss or damage shall pass from Supplier to Purchaser's customers upon receipt at Purchasers customer's facility.

5. **Inspection.** Purchaser shall inspect the Products received under this Agreement and conduct its own in-house testing of the Products within five (5) days of receipt from Supplier's facility ("*Inspection Period*") and notify Supplier within the Inspection Period in the event of a Non-Conforming Product. "*Nonconforming Products*" means any Products received by Purchaser from Supplier pursuant to a Purchase Order that do not conform to the type or quantity listed in the applicable Purchase Order. If Purchaser determines that such Products are Nonconforming Products, as Purchaser's sole remedy with respect to Nonconforming Products, Supplier shall either: (i) replace such Nonconforming Products with conforming Products; or (ii) refund to Purchaser such amount paid by Purchaser to Supplier for such Nonconforming Products returned by Purchaser to Supplier; provided however, Supplier shall not be obligated to replace Nonconforming Products or provide refund in the event of a breach by Purchaser of this Agreement or written instructions provided by Supplier with respect to storage, shipping and handling of the Products. Supplier shall provide 3rd party full panel results from KCA Labs, or a lab mutually agreed upon by Supplier and Purchaser on any lots provided to Purchaser. Purchaser agrees to use 3rd party results provided as the sole basis for the determination of Nonconforming Products for all specifications outlined in the 3rd party test. In the event that Purchaser desires to Purchase Products from Supplier prior to Supplier's ability to provide 3rd party full panel results, Purchaser, with written notice to Supplier, may waive such 3rd party full panel results requirements and purchase Products from Purchaser on analytics derived from Purchaser's in-house testing and Purchaser will not have the right to reject products or declare a Non-Conforming Product based on full panel results from a third-party lab. All Products are sold as work-in-process material, and the Supplier disclaims any warranty of fitness for human consumption of Products, which the Buyer expressly acknowledges and accepts. Notwithstanding the foregoing, in the event Supplier receives Nonconforming Products from a vendor, Purchaser agrees to assist Supplier in obtaining conforming products in order to recover its losses or provide Purchaser with conforming products.

6. **Force Majeure.** Neither party shall be liable for delays in or for failures to perform hereunder (other than a payment obligation) due to causes beyond its reasonable control, including acts of God, acts or omissions of the other party or a third party, labour disputes, acts of civil or military authorities, fire, strikes, power surges or outages, epidemics, flood, earthquakes, riot, or war. Each party shall use commercially reasonable efforts to provide the other party with notice of any such events and recommence performance as soon as is practicably possible.

7. **Responsibilities of the Parties.** Each Party shall provide to the other Party, and shall cause its representatives to provide any documents, data or other information that: (a) have been reasonably requested by a Party and is reasonably required by such Party to perform its services and obligations hereunder; (b) are required for such Party to meet terms and conditions imposed by any governmental entity; or (c) are required by such Party to comply with applicable laws. Supplier represents and warrants that (a) it holds all necessary rights and licenses to produce and sell the Products in accordance with this Agreement; (b) it shall comply with all laws applicable to such Party and its manufacture, sale, and distribution of the Products as a work-in-process material that is not fit for human consumption. Purchaser represents and warrants that (a) it holds all necessary rights and licenses to purchase and sell the Products in accordance with this Agreement; (b) it shall comply with all laws applicable to such Party and its sale, purchase and/or use of the Products.

8. **Recall.** At all times, in the event that: (a) any governmental or regulatory entity issues a request, directive or order that a Product be recalled; or (b) a court of competent jurisdiction orders such a recall; or (c) Supplier reasonably determines that a Product should be recalled because the Product does not conform to applicable laws, or reasonably raised safety issues or concerns with the Products (each, a "**Recall**"), the Parties shall take all appropriate corrective actions reasonably requested by the other Party hereto or by any governmental or regulatory entity or court and the Parties agree to use commercially reasonable efforts in good faith to cooperate with and assist each other, including with any Recall or notice and with the required reporting and record-keeping as requested, in accordance with the investigating and reporting obligations prescribed by applicable laws; provided

however, Supplier shall not be responsible or liable for any actions or costs arising from or relating to a Recall in the event a Recall relates to Purchaser's sale of the Products in non-compliance with applicable laws.

9. **Term and Termination.** The term of this Agreement will begin on the Effective Date and will expire on the date that is one (1) year after the Effective Date unless terminated earlier (the "**Initial Term**"). This Agreement will automatically renew for succeeding terms of one (1) year unless either Party provides written notice of non-renewal at least thirty (30) days prior to the expiration of the then-current term (each, a "**Renewal Term**" and together with Initial Term, the "**Term**"). Either Party may terminate this Agreement: (a) if the other Party has breached any material provision of the Agreement and such breach continues unremedied for a period of thirty (30) days after its receipt of written notice thereof from the other Party; (b) the other Party becomes the subject of bankruptcy, insolvency, receivership or other similar proceedings; or (c) upon a Change of Control of the other Party. For purposes of this Agreement, a "Change of Control" means the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group of equity interests representing more than fifty percent (50%) of the aggregate voting power represented by the issued and outstanding equity interests of that Party. If, at any time, Supplier in its reasonable discretion determines that Purchaser's financial condition or creditworthiness is such that Purchaser may be unable to meet its financial obligations under this Agreement, Supplier may terminate the Agreement upon thirty (30) days written notice, during which notice period, Supplier may pause the supply of Products pending receipt of documentation which adequately demonstrates the strength of Purchaser's financial condition or creditworthiness such that Supplier in its reasonable discretion determines Purchaser is capable of meeting its financial obligations hereunder. Purchaser shall pay to Supplier all amounts owing under this Agreement for all Products that have been produced in compliance with the terms of this Agreement prior to the effective date of termination or expiration.

10. **Confidentiality and Circumvention.** Each Party hereto agrees with the other that, it and its representatives will hold in strict confidence all data and information obtained with respect to another Party or any subsidiary thereof from any representative, officer, director or employee, of such other Party, and shall not use such data or information or disclose the same to others, except to the extent such data or information is published, is a matter of public knowledge, or is required by law to be published. In the event of the termination of this Agreement, each Party shall return to the other Party all documents and other materials obtained by it or on its behalf and shall destroy all copies or other materials relating thereto. To the extent that a Party is required to disclose information by applicable law or a court of competent jurisdiction, it shall not make any such disclosure without first notifying the other Party and allowing the other Party a reasonable opportunity to seek injunctive relief from (or a protective order with respect to) the obligation to make such disclosure. Additionally, the Parties agree and acknowledge an affirmative obligation to the other Party to keep the terms and conditions of this Agreement confidential.

    10.1 For the avoidance of confusion, the Parties agree not to circumvent one another's rights and duties to fulfill its obligations under this Agreement. Further, Supplier agrees not to circumvent Purchaser's exclusive rights under this Agreement to distribute the Products. Finally, Supplier agrees to not knowingly sell the Products to any of Purchaser's Customers.

11. **Exclusive Distribution Terms**.

    11.1 <u>Exclusive Right of First Purchase</u>. Supplier grants Purchaser Exclusive Worldwide First Right of Purchase / Distribution for Supplier's supply of water-soluble delta-9 THC powder, hemp-derived delta-9 THC distillate, tetrahydrocannabinolic acid isolate (THCA Isolate), and tetrahydrocannabinolic acid hemp flower (THCA Flower) and other products as may be later mutually agreed upon in a writing signed by both Supplier and Purchaser ("Product(s)").

12. **Records**. Each Party shall maintain all such documents, records and other information as required under applicable laws ("**Records**"). Each Party shall retain the Records for a period equal to the longer of: (a) the retention period for such Records required by applicable laws or applicable accounting standards (whichever is greater); or (b) three (3) years after the end of the Term. Each Party shall, upon the other Party's reasonable

request, and subject to applicable laws and at such other Party's sole cost and expense, make such Records available to such other Party, upon reasonable notice and during normal business hours.

13. **Trademarks**. Except as otherwise expressly provided for herein, nothing in this Agreement shall be read or construed as a grant of a license by one Party to the other Party to use the trademarks or such other intellectual property rights owned or controlled by such Party or its affiliates.

14. **Indemnification**. Purchaser shall defend, indemnify and hold harmless Supplier and its affiliates and each of their respective directors, officers, employees and agents from and against, any and all claims, actions, judgments, losses, damages, interest, awards, settlement amounts, liabilities, costs, expenses, fines or penalties (including reasonable legal fees and expenses) (collectively, "**Losses**") to the extent arising out of or resulting from any third party claim, suit, action, proceeding or government order or prosecution ("**Claim**") regarding (a) Purchaser's failure to comply with applicable laws; (b) Purchaser's or its affiliates' and their respective employees' and representatives' infringement of Supplier's intellectual property rights; (c) Purchaser's gross negligence; and (d) any breach of a representation or warranty made under this Agreement.

Supplier shall defend, indemnify and hold harmless Purchaser and its affiliates and each of their respective directors, officers, employees and agents from and against, any and all claims, actions, judgments, losses, damages, interest, awards, settlement amounts, liabilities, costs, expenses, fines or penalties (including reasonable legal fees and expenses) (collectively, "**Losses**") to the extent arising out of or resulting from any third party claim, suit, action, proceeding or government order or prosecution ("**Claim**") regarding (a) Supplier's failure to comply with applicable laws; (b) Supplier's or its affiliates' and their respective employees' and representatives' infringement of Supplier's intellectual property rights; (c) Supplier's product quality and suitability for human consumption; Supplier's gross negligence; and (d) any breach of a representation or warranty under this Agreement.

15. **Representations, Warranties, and Covenants**. Each party shall comply with all applicable governmental laws, ordinances, rules and regulations, including without limitation all laws, ordinances, rules and regulations which may govern the production, manufacture, importation, transportation, storage, marketing, distribution, sale, use and disposal of the Products, as well as all other applicable laws which relate to that party or its business or the way the business is carried on. Except as specifically provided herein, each party shall be responsible for all costs and obligations associated with its business operations incurred in its performance of this Agreement. Neither party shall do any of the following: (i) represent itself as an agent of the other party for any purpose; (ii) pledge the other party's credit; (iii) make any promise, guaranty or warranty about the Products on behalf of the other party; or (iv) commit the other party to any third-party contract or obligation. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO THE PRODUCTS. ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY EACH PARTY.

16. **Insurance**. Each Party shall, for the duration of this Agreement and at its own expense, maintain and carry commercial general insurance (including product liability) with limits no less than $1,000,000 per occurrence with financially sound and reputable insurers. On a Party's request, the other Party shall provide the requesting Party with a certificate of insurance from the insured Party's insurer evidencing the insurance coverage specified in this Section, which certificate shall name the other Party as an additional insured. Each Party shall provide the other Party with advance notice in the event of a cancellation or material change in its insurance policy, providing as much notice as is reasonably practicable.

17. **Governing Law.** This Agreement shall be governed by, and construed in accordance with, the internal laws (as opposed to conflicts of law provisions) of the State of North Carolina. Each Party agrees that any state or federal court within the State of North Carolina shall have exclusive jurisdiction of any action or proceeding relating to, or arising under or in connection with this Agreement and each Party consents to personal jurisdiction of such courts and waives any objection to such courts' jurisdiction. The Parties hereto agree that any claim or suit between the Parties relating to or arising under or in connection with this Agreement may only be brought in and decided by the state or federal courts located in the State of North Carolina, such courts being a proper forum in

which to adjudicate such claim or suit, and each Party hereby waives any objection to each such venue and waives any claim that such claim or suit has been brought in an inconvenient forum. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

18. **General Provisions**. (a) In performing their obligations hereunder, the Parties and any third parties acting on behalf of the Parties shall act solely as independent contractors. No Party shall have any power or authority to bind or commit any other Party. (b) Any notice or other communication required or permitted to be given pursuant to this Agreement shall be deemed to have been sufficiently given if in writing and either delivered by e-mail, overnight courier service against receipt or sent by registered or certified mail, return receipt requested. (c) This Agreement, Purchase Orders and Supplier Invoices constitute the entire agreement between the Parties pertaining to the subject matter hereof. No amendment of this Agreement shall be effective unless made in writing and signed by the Parties. (d) A waiver of any default, breach or non-compliance under this Agreement shall not be effective unless in writing and signed by the Party to be bound by the waiver. (e) Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to that jurisdiction, be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. (f) Neither Party may assign or otherwise transfer its rights or obligations under this Agreement in whole or in part, without the express prior written consent of the other Party. This Agreement shall endure to the benefit of, and be binding on, the Parties and their respective successors and permitted assigns. (g) This Agreement may be executed in counterparts, each of which shall be deemed to be an original and both of which taken together shall be deemed to constitute one and the same instrument. (h) Sections 2-4 and 9-18, inclusively, shall survive any termination or expiration of this Agreement. (i) In the event that any party institutes any legal suit, action, or proceeding against the other party to arising out of this Agreement, the prevailing party in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action, or proceeding, including reasonable/actual attorneys' fees and expenses and court costs.

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the Effective Date.

| Asterra Labs, LLC | MC Botanicals, LLC |
|---|---|
| By: *[signature]* | By: *Bret Worley* |
| Name: DANIEL WADSWORTH | Name: Bret Worley |
| Title: COO | Title: President |