IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:25-cv-00400-BO

| | | |
|---|---|---|
| MC BOTANICALS LLC and MC NUTRACEUTICALS LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ASTERRA LABS, LLC; RISE CAPITAL, LLC; and RYAN MCCONNELL; | ) ) ) | |
| Defendants. | ) ) ) | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEEFENDANT RYAN MCCONNELL'S PARTIAL MOTION TO DISMISS** |
| _____ | ) | |
| ASTERRA LABS LLC, | ) | |
| Counter-Plaintiff, | ) | |
| V. | ) | |
| BRET C. WORLEY, JEFFREY A. WORLEY, MC BOTANICALS LLC, MC NUTRACEUTICALS LLC, A COLORADO LIMITED LIABILITY COMPANY, MC NUTRACEUTICALS LLC, A TEXAS LIMITED LIABILITY COMPANY, AND MC GLOBAL HOLDINGS LLC, | ) ) ) ) ) ) ) ) ) | |
| Counter-Defendants. | ) | |

Plaintiffs MC Botanicals LLC ("MC Botanicals") and MC Nutraceuticals LLC

("MC Nutraceuticals"; together with MCB, collectively, "Plaintiffs" or "MC")

respectfully submit this memorandum in opposition to the partial motion to dismiss

filed by Defendant Ryan McConnell ("McConnell").

## FACTUAL BACKGROUND

Jeff and Bret Worley, a father and son team, are the principals of MC Botanicals and MC Nutraceuticals, Texas limited liability companies. (ECF No. 1, Compl., ¶¶ 9, 1-2). MC Nutraceuticals is a national industry leader in lobbying, regulatory reform and distribution in the industrial hemp-based bulk sector, with operations focused on federally-legal cannabinoids. (*Id.*).

Founded in 2019, Asterra bills itself as a producer, manufacturer, and distributor of "premium wholesale and white label CBD and hemp products," but the company had struggled to find its footing in the hemp-derived flower and cannabinoid product market. (ECF No. 1, ¶ 15).

Rise Capital is Asterra's deep-pocketed private equity owner. Harry Smith is Rise Capital's manager. (*Id.* at ¶¶ 4, 16, 22). By 2024, Rise Capital had already sunk approximately $10 million into Asterra. (*Id.* at ¶ 17). Even with this enormous investment, Asterra had developed only a small finished-goods revenue stream. (*Id.* at ¶ 18). Prior to its partnership with MC, Asterra was mostly cash flow negative. (*Id.* at ¶ 19).

Attracted by Rise Capital's substantial financing capabilities and its principal, Harry Smith's, powerful, North Carolina-based political networks, MC approached Asterra in December 2024 about forming a commercial relationship whereby MC, for all intents and purposes, would help Asterra find its footing in the dynamic and intensely competitive regulated cannabinoid market. (*Id.* at ¶ 22).

MC Botanicals and Asterra entered into a Manufacturing and Distribution Agreement (the "Manufacturing and Distribution Agreement"). A true and correct copy of this agreement is attached as Exhibit to Plaintiffs' Complaint. (*Id.* at ¶ 25).

### Rise Capital Acts as Negotiator After Asterra Fails to Fulfill Its Obligations, and MC Moves to Cover at Its Own Expense

Within weeks of entering into the Manufacturing and Distribution Agreement, it was clear to MC Botanicals that Asterra was in breach of its performance obligations. (*Id.* at ¶¶ 31-32). Plaintiffs covered for Asterra's breaches at their own expense. (*Id.* at ¶¶ 33). Efforts included sending two employees, including McConnell, to North Carolina to assist Asterra in its operations. (*Id.* at ¶¶ 35-43).

During this period, Rise Capital would interject itself to act as chief negotiator on behalf of Asterra in operations discussions, and in protracted negotiations regarding funding and pricing with MC Botanicals. (*Id.* at ¶ 46).

### With MC's Intervention and Oversight, Asterra's Revenues Skyrocket, and MC, Rise Capital, and Asterra Discuss the Next Phase of Their Commercial Relationship

Thanks to the assistance of MC personnel and MC's herculean efforts to cover for Asterra's deficiencies at MC's expense, Asterra's revenues doubled. (*Id.* at ¶ 48). MC Botanicals, for its part and despite all it had had to do to cover for Asterra's deficiencies, still considered continuing business with Asterra an attractive prospect on account of Rise Capital's powerful financial backing and inventory financing capabilities. (*Id.* at ¶ 51). Accordingly, MC Botanicals, Rise Capital, and Asterra engaged in numerous discussions about possible mergers and roll-ups to combine MC's industry knowledge, national and international network, and regulatory

support services with Asterra's financing capabilities through Rise Capital. (*Id.* at ¶ 52). During these discussions, MC personnel in and outside of North Carolina continued to cover for Asterra's many operational deficiencies. (*Id.* at ¶ 53). Upon information and belief, however, even as these discussions progressed, Defendants were conspiring to take what they could from MC, including trade secrets, personnel, and inventory, and drive MC out of North Carolina to establish Defendants' desired position as captains of the North Carolina cannabinoid industry. (*Id.* at ¶ 54).

### Defendants, Capitalizing on Cannabinoid Market Disruption in May 2025, Make Their Play Against MC

In the second fiscal quarter of 2025, threatened regulatory changes in the Texas cannabinoid market contributed to a high degree of national market turbulence. (*Id.* at ¶ 55). This market turbulence contributed to an acute, temporary disruption of MC's financing systems and cash flow. (*Id.* at ¶ 57).

On information and belief, Asterra and Rise Capital saw their opportunity to make a play against MC. (*Id.* at ¶ 58). Over Memorial Day Weekend 2025, MC Botanicals, because of MC's cash flow disruption, was a few days late on making payment of Asterra Invoices. (*Id.* at ¶ 59).

Operating in good faith, MC Botanicals, going into Memorial Day Weekend, notified Asterra and Rise Capital that it would likely be late in paying Asterra Invoices in question because of MC's acute, temporary cash flow disruption. (*Id.* at ¶ 60). Asterra and Rise Capital provided assurances that they would continue to perform their obligations during MC Botanicals' temporary delay in payment of Asterra Invoices. (*Id.* at ¶ 61).

4

<u>Rise Capital's Tortious Interference with Contract</u>

On June 5, 2025, however, just days after the Asterra Invoices in question came due, Rise Capital told MC Botanicals—inconsistent with the prior assurances—that Asterra would not be performing its obligations under the Manufacturing and Distribution Agreement or taking any further corrective measures related to defaults in its prior contractual performance. (*Id.* at ¶ 62). In other words, Rise Capital used the minor and temporary payment delays as an excuse to cause Asterra to completely repudiate the Manufacturing and Distribution Agreement. (*Id.* at ¶ 63).

Defendants did not ask MC Botanicals for further assurances that it could perform its contractual obligations of making payments on the Asterra Invoices with late-payment interest as contemplated by Section 3 of the Manufacturing and Distribution Agreement, nor did they provide MC Botanicals any 30-day cure period, as would have been required if in fact MC Botanicals' days-long default in payment of Asterra Invoices was a material default, which MC Botanicals denies. (*Id.* at ¶ 64). In fact, while MC Botanicals repeatedly told Defendants that it would be able to pay the Asterra Invoices relatively promptly, and that MC's cash flow issue was temporary, Defendants made it clear that they would *not* accept late payment with interest, as contemplated by Sections 3 and 9 of the Manufacturing and Distribution Agreement. (*Id.* at ¶ 65).

Instead, Rise Capital and Asterra demanded that MC Botanicals pay $50,000 a day if MC Botanicals wanted Asterra to perform its contractual obligations. (*Id.* at ¶ 66). Rise Capital and Asterra further refused to credit MC Botanicals the estimated

$100,000 to $150,000 worth of MC Botanicals Inventory missing from Asterra's possession as an offset to their demands for payment. (*Id.* at ¶ 67).

MC was taken by surprise by the total repudiation of its contractual obligations after only a few days' delinquency in MC Botanicals' payment obligations, and after months of MC Botanicals covering for Asterra's multiple failures to perform its obligations. (*Id.* at ¶ 68). Indeed, only the week before, MC Botanicals had been in intensive merger discussion with Asterra and Rise Capital. (*Id.* at ¶ 69).

<u>McConnell is Poached from MC Nutraceuticals to Work for Asterra</u>

At the same time Rise Capital told MC Botanicals that it had caused Asterra to repudiate the Manufacturing and Distribution Agreement, McConnell, who was still in North Carolina with Asterra providing operational support on behalf of MC, suddenly provided notice to MC Nutraceuticals that he was resigning from MC Nutraceuticals. (*Id.* at ¶ 69).

Upon information and belief, as part of their play against MC, Asterra and Rise Capital had approached McConnell about leaving MC Nutraceuticals to join Asterra permanently and to lead the company's sales efforts. (*Id.* at ¶ 70). Asterra and Rise Capital understood how essential McConnell could be in helping them essentially take MC's business for themselves, and that McConnell had access to MC's valuable trade secrets and confidential and proprietary information. (*Id.*). Indeed, having risen to Senior Director of Sales for MC Nutraceuticals, McConnell had almost complete access to MC's sensitive, confidential, proprietary information related to the cannabinoid industry. (*Id.* at ¶ 71). This information included, without limitation:

a. Customer lists for MC Nutraceuticals and MC Botanicals, providing, among other things, names and contact information; pricing information; product preferences; product specifications, including, without limitation, chemical compositions, SKU information, and potency information; manufacturing formulas and manufacturing practices for customer-specific cannabinoid b lends; payment terms; transaction margins; purchase frequencies; and customer relationship history and notes.

b. Vendor lists for MC Nutraceuticals and MC Botanicals, providing, among other things, names and contact information; pricing information; SKUs purchased; vendor-customer fit analyses; multi-jurisdictional regulatory compliance and harmonization analyses; payment terms; transaction margins; purchase frequence; relationship history and notes; general ledgers and MC financial reports; all intercompany activity for MC Botanicals; and global regulatory and lobbying strategy documents for MC Botanicals and MC Nutraceuticals.

(*Id.*).

McConnell was bound by valid, enforceable post-employment restrictive covenants. For good and valuable consideration, he had previously entered into a Mutual Confidentiality Agreement with MC Nutraceuticals, effective April 17, 2023 (the "McConnell Employment Agreement"). (*Id.* at 72). A true and correct copy of the McConnell Employment Agreement is attached to Plaintiffs' Complaint as <u>Exhibit C</u>.

The McConnell Employment Agreement is governed by Texas law. (McConnell Employment Agreement, ¶ 7(a)).

The McConnell Employment Agreement contains non-disclosure and non-solicitation provisions lasting for one (1) year following McConnell's termination or resignation from MC Nutraceuticals. (*Id.* at ¶ 73). McConnell's motion to dismiss does not challenge the McConnell Employment Agreement's confidentiality and non-disclosure provisions. (*See* McConnell Employment Agreement, ¶¶ 1-4). Rather, McConnell specifically challenges in his motion to dismiss is Paragraph 5, which reads as follows:

> 5. Non-Circumvent
>
> In the event McConnell ceases to be employed by [MC Nutraceuticals] for any reason, [McConnell] may not contact or enter into any agreement directly, or through [his] agents or subsidiaries or by any other means, with any individual or entity that was a Customer of [MC Nutraceuticals] or its affiliates. The direct contact of such third parties by McConnell, without the written consent of MCN shall be a material breach of this Agreement.

(McConnell Employment Agreement, ¶ 5).

Upon information and belief, Asterra and Rise Capital knew or should have known of the McConnell Employment Agreement and that McConnell was subject to restrictive covenants similar to those contained in Section 10 of the Manufacturing and Distribution Agreement, which prohibited him from sharing confidential or proprietary information or trade secrets and from soliciting MC customers. (*Id.* at ¶ 74). Rise Capital had been intensively involved in negotiations involving McConnell's effective secondment to Asterra to cover for Asterra's breaches of the Manufacturing and Distribution Agreement. (*Id.* at ¶ 46).

Despite this knowledge, Asterra and Rise Capital procured McConnell's breach of his obligations under the McConnell Employment Agreement and have since approached other senior MC employees about leaving, in direct violation of their similar agreements with MC. (*Id.* at ¶ 75).

Asterra and Rise Capital have already benefited from McConnell's access to MC Nutraceuticals's trade secrets and proprietary and confidential information, access to which they were never entitled, and from McConnell's access to MC Botanicals's trade secrets and proprietary and confidential information to which they only selectively were entitled. (*Id.* at ¶ 77). Defendants are using MC Nutraceuticals' customer lists to solicit business, and further using the financial information and regulatory strategy information of MC Nutraceuticals and MC Botanicals as leverage in this dispute. (*Id.*). McConnell, as Asterra's agent, has solicited business from Golden Hour Hemp, an MC Customer, in violation of the non-solicitation provisions of the McConnell Employment Agreement and of Asterra's non-circumvention obligations under the Manufacturing and Distribution Agreement. (*Id.* at ¶ 77(b)). Evidence further shows that Asterra is using MC customer and vendor lists to solicit other vendors and customers. (*Id.* at ¶ 77(a)).

<u>Defendants Take the MC Botanicals Inventory for Themselves</u>

At the same time Rise Capital was causing Asterra to repudiate the Manufacturing and Distribution Agreement and procuring McConnell's breaches of his Employment Agreement, it was also directing Asterra to convert the MC

Botanicals Inventory, title to which belonged to MC Botanicals pursuant to the Manufacturing and Distribution Agreement, for themselves. (*Id.* at ¶ 79).

While refusing to account for the MC Botanicals Inventory in their possession, Defendants made it clear that they would not release any MC Botanicals Inventory to MC Botanicals, or even recognize MC Botanicals' interest in the MC Botanicals Inventory, until MC Botanicals capitulated to Defendants' demands. (*Id.* at ¶ 80).

Defendants even began attempting to sell away the MC Botanicals Inventory for their exclusive benefit, in violation of the Manufacturing and Distribution Agreement and applicable law. (*Id.* at ¶ 81).

<u>Rise Capital's Escalating Threats Against Plaintiffs</u>

In the weeks leading up to the filing of the instant lawsuit, Rise Capital, through direct communications from Rise Capital manager Harry Smith, threatened to use his powerful North Carolina networks to have Plaintiffs' principals investigated, prosecuted, and thrown in jail if they did not immediately capitulate to Defendants' demands for payment, release from any contractual obligations, and title to the MC Botanicals Inventory. (*Id.* at ¶ 84). The following is one of a number of such threats, sent via text to Jeff Worley:



08:24

< 404    Harry ›

Mon, Jun 16 at 14:47

i'm going to put you and your son in jail - hitting private investigators and opposition research teams today. You buckle up Jeff - I will see you and your unstable son in a court room. It's all principle to me - right versus wrong - you guys are absolute frauds. You picked the wrong guy and the wrong company to try and steal from. Buckle up / see you in depositions

hiring

Tue, Jun 24 at 06:16

we have more than enough to get BOTH of you criminally charged and we are going to do that - pay us or go to prison right here in the great state of NC Jeff - no reply needed.

Today 07:15

Jeff - I'm beyond confidant that you both get convicted of a felony(s) and I'm beyond convinced we will be able to come after you both personally on the civil side. Pay your bills or I can't help you - once the civil and criminal investigation begins there is no stopping it. Spending 10 years in prison in NC isn't a great retirement plan

iMessage

footer

page number 11

(*Id.*).

Defendants reiterated these threats via counsel if MC refused to capitulate to Defendants' demands. (*Id.* at ¶¶ 86-87).

Plaintiffs refused to capitulate to these improper demands, and brought the instant lawsuit asserting claims against McConnell for breach of the McConnell Employment Agreement (Count Two, *id.* at ¶¶ 95-99); breach of implied the implied duty of good faith and fair dealing (Count Three, *id.* at ¶¶ 100-03); unjust enrichment, in the alternative to Count One (Count Four, *id.* at ¶¶ 104-08); state misappropriation of trade secrets (Count Seven, *id.* at ¶¶ 123-35); federal misappropriation of trade secrets (Count Eight, *id.* at ¶¶ 136-41); and unfair and deceptive trade practices. (Count Ten, *id.* at ¶¶ 142-49).

McConnell moves under Rule 12(b)(6) to dismiss Plaintiffs' breach of contract claim (Count Two) *in part*, arguing that Paragraph 5 of the McConnell Employment Agreement (non-circumvention) is unenforceable, and Plaintiffs' breach of the implied duty of good faith and fair dealing (Count Three), unjust enrichment (Count Four), and unfair and deceptive trade practices (Count Ten) in their entirety. McConnell does not move for dismissal of Plaintiffs' breach of contract claim related to McConnell's alleged breaches of his confidentiality and non-disclosure obligations, nor does he move for dismissal of Plaintiffs' claims for misappropriation of trade secrets.

## STANDARD OF REVIEW

A motion to dismiss made pursuant to Rule 12(b)(6) "challenges the legal sufficiency of a complaint considered with the assumption that the facts alleged are true." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). To overcome a motion to dismiss, a complaint need only "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a Rule 12(b)(6) motion, all reasonable inferences are construed in favor of the plaintiff as the non-movant. *Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017).

## ARGUMENT

### I.    Plaintiffs' Breach of Contract Claim (Count Two)

McConnell moves under Rule 12(b)(6) to dismiss Plaintiffs' breach of contract claim (Count Two) in part, arguing that Paragraph 5 of the McConnell Employment Agreement (non-circumvention) is overbroad and thus facially unenforceable. Paragraph 5 provides:

> 5. Non-Circumvent
>
> In the event McConnell ceases to be employed by [MC Nutraceuticals] for any reason, [McConnell] may not contact or enter into any agreement directly, or through [his] agents or subsidiaries or by any other means, with any individual or entity that was a Customer of [MC Nutraceuticals] or its affiliates. The direct contact of such third parties by McConnell, without the written consent of MCN shall be a material breach of this Agreement.

(McConnell Employment Agreement, ¶ 5).

McConnell does not move for dismissal of Plaintiffs' breach of contract claim related to alleged breaches of his confidentiality and non-disclosure obligations.

For purposes of his motion McConnell does not contest that the McConnell Employment Agreement is governed by Texas law. (McConnell Memo at 6, fn. 1). Texas's Covenants Not to Compete Act, TEX. BUS. & COM. CODE § 15.50 *et seq.* (the "Act"), governs both non-competition and non-solicitation provision under Texas law, as well as the "non-circumvention" provision at here, which can be read fairly as a hybrid between the two. *See Shoreline Gas, Inc. v. McGaughey*, 2008 Tex. App. LEXIS 2760 (Tex. App. Corpus Christi Apr. 17, 2008) ("Although the [Act] does not, on its face, apply to nonsolicitation agreements, a nonsolicitation agreement is sufficiently analogous to a covenant not to compete that the provisions of the Act must apply fully to such agreements."); *see also Marsh U.S.A., Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) (treating any agreement that prohibits a departing employee from "accepting business" from former and perspective clients as a covenant not to compete for purposes of the Act); *Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556, 562 (4th Cir. 1990) (treating a "Noncircumvention and Nondisclosure Agreement" as a covenant not to compete because it was "merely a twist on employment noncompetition agreements.").

Under the Act "a covenant not to compete [or non-solicitation covenant] is enforceable if it is (1) ancillary to or part of another agreement at the time the agreement is made (2) to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the prime." TEX. BUS. & COM. CODE § 15.50(a). With regard to

the first prong, Texas courts consider covenants not to compete ancillary or part of another agreement if it established that (a) the consideration given by the employer in the agreement is reasonably related to an interest worthy of protection and (b) the covenant not to compete was designed to enforce the employee's consideration or return promise in the agreement. *PetroChoice Holdings, LLC v. Pearce*, 2021 Tex. App. LEXIS 272, * 10 (Tex. App. Tyler January 13, 2021).

Notably, facial overbreadth of a non-competition or non-solicitation provision is ***not*** grounds for dismissal of a related claim for breach. Rather, "[i]f the covenant is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court ***shall reform the covenant to the extent necessary*** to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promise." TEX. BUS. & COM. CODE 15.51(c) (emphasis added).

In other words, Texas law ***requires*** reformation, rather than dismissal, of overbroad but otherwise valid post-employment restrictive covenants. *See Republic Servs. v. Rodriguez*, 2014 Tex. App. LEXIS (Tex. App. Houston 14th Dist. June 26, 2014); *see also Rimkus Consulting Group, Inc. v. Phillips*, 2003 Tex. App. LEXIS 149 (Tex. App. Waco Jan. 8 2003); *Republic Servs. v. Rodriguez*, 2014 Tex. App. LEXIS

6957 (Tex. App. Houston 14th Dist. June 26, 2014 (finding that statute required reformation of an unenforceable industry-wide prohibition in noncompete). This requirement applies to North Carolina courts applying Texas law, too. *See Redlee/Scs, Inc. v. Pieper*, 153 N.C. App. 421, 426-27, 571 S.E.2d 8, 13 (2002).

Here, McConnell does not contest the validity of the non-circumvention provision on the grounds that it was not "reasonably related to an interest worthy of protection" or "designed to enforce the employee's consideration or return promise in the agreement." *See PetroChoice Holdings, LLC*, 2021 Tex. App. LEXIS at * 10. Rather, McConnell's argument is narrower: because the non-circumvention provision is overbroad, it should be dismissed. (McConnell Memo at 7-9). As discussed, however, dismissal for overbreadth in ***not*** allowed under the Act, which uses mandatory language to ***require*** reformation instead of dismissal in the event that the Court agrees with a movant's argument. *See* TEX. BUS. & COM. CODE 15.51(c); *see also Republic Servs. v. Rodriguez*, 2014 Tex. App. LEXIS 6957'; *See Redlee/Scs, Inc.*, 153 N.C. App. at 426-27, 571 S.E.2d at 13 (2002). McConnell does not ask for reformation of the provision in question, but rather pretends like the relevant provisions of Section 15.51 of the Act do not exist. This is because Texas courts have also found that determination of whether and how a provision governed by the Act should be reformed is also not appropriate on a Rule 12(b)(6) motion, where an employee cannot show that an employer could not recover as a matter of law "even under a noncompete that has been reformed," and where the parties do not have the appropriate opportunity to brief the issue. *DeWolff Boberg & Assocs. v. Clark*, 2023 U.S. Dist.

LEXIS 14793, at * 9 (N.D. Tex. Aug. 23, 2023) (quoting Orthoflex, Inc. v. ThermoTek, Inc., 2011 U.S. Dist. LEXIS 135362, at * 1) (N.D. Tex Nov. 23, 2011).

McConnell's partial motion to dismiss Plaintiffs' breach of contract claim therefore should be denied. To the extent McConnell's next move will be to ask in his reply brief for reformation of the provision in the McConnell Employment Agreement he claims is overbroad, that request too should be denied as an issue for another day.

## II. Plaintiffs' Claim for Breach of the Implied Duty of Good Faith and Fair Dealing (Count Three)

McConnell next argues that Plaintiffs' related claim for breach of the implied duty should be dismissed under Texas law.

Texas law does not recognize a duty of good faith and fair dealing in every contract or business transaction. Instead, such a duty "has only been applied to protect parties who have a special relationship based on trust **or** unequal bargaining power." *Natividad v. Alexsis, Inc*., 875 S.W.2d 695, 697 (Tex.1994) (emphasis added). Texas law does not recognize the duty in the typical employment context. *See City of Midland v. O'Bryant*, 18 S.W.3d 209, 216 (Tex. 2000).

McConnell argues that because the relationship in question is an employment relationship, and because Plaintiffs do not allege any "special relationship based on trust" between MC Nutraceuticals and McConnell, Plaintiffs' good faith and fair dealing claim fails as a matter of law. (McConnell's Memo at 10). As alleged, however, this is *not* a run of the mill employee-employment relationship, and, in fact, MC Nutraceuticals placed an extraordinary amount of trust in McConnell in directing his months'-long secondment to Asterra, with whom it had an arms-length commercial

relationship. (*Compl.* at ¶¶ 35-43, 31-33, 22, 52-53, 68-69). As alleged, Asterra had breached its obligations under the Manufacturing and Distribution Agreement almost as soon as entering into it. (*Id.*). As alleged, MC Nutraceuticals tasked McConnell with fixing Asterra's operations to enable it to hold up its end of the bargain, at the same time Asterra sought to jockey for market position through a potential merger with an MC affiliate (*Id.*). In doing so MC Nutraceuticals, MC Nutraceuticals counted on McConnell to thread a careful needle and negotiate number of moral hazards with a potential competitor (or, at the very least, a self-interested party to a potential merger transaction) not typical in a normal employer-employee context. McConnell cannot show that this sort of special trust, in the context of a secondment relationship, precludes a finding of duty under Texas law, and his motion to dismiss this claim should be denied accordingly.

McConnell also argues that to the extent that, for whatever reason, North Carolina law applies to Plaintiffs' claim for breach of the implied duty of good faith and fair dealing, the claim is similarly defective, because the claim is based on the same acts as Plaintiffs' claim for breach of contract. Even if, however, North Carolina law applied, McConnell still would not be entitled to dismissal of the claim as a matter of law.

Every enforceable North Carolina contract contains an underlying, implied covenant of good faith and fair dealing. *Bicycle Transit Auth. v. Bell*, 314 N.C. 2019, 228 (1985). "A claim for breach of this implied covenant arises when one party 'wrongfully deprives' the other of some benefit 'to which they were entitled,' or takes

some sort of other action for a 'wrongful or unconscionable purpose.'" *Wadhwania v. Wake Forest Univ. Baptist Med. Ctr.*, 262 N.C. App. 510 (2018) (citation omitted). "As a general proposition, where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, [our courts] treat the former claim as "part and parcel" of the latter. *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 19 (1996), *disc. review denied*, 345 N.C. 344 (1997). Well-settled law, however, allows for independent claims for breach of the duty of good faith and fair dealing to cover contractual gaps—for instance, "where a defendant behaves in an unexpected manner, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Value Health Solutions, Inc. v. Pharmacy*, 386 N.C. 250, 268, 891 S.E.2d 100, 105 (2023) (emphasis added); *see also Cordaro v. Harrington Bank*, 260 N.C. App. 26, 38-39, 817 S.E.2d 247, 256 (2018).

Based on Plaintiffs' allegations, the trier of fact may find the existence of one or more such "contractual gaps" with respect to McConnell's obligations under the McConnell Employment Agreement in the unique secondment context, where McConnell, while working on behalf of MC Nutraceuticals, was directed to use company information subject to the McConnell Employment Agreement for the discrete purpose of helping Asterra cure its breaches and prevent future breaches under the Manufacturing and Distribution Agreement. For this reason, to the extent North Carolina law were to cover this claim, McConnell still would not be entitled to its dismissal under Rule 12(b)(6).

### III. Plaintiffs' Unjust Enrichment Claim (Count Four)

With respect to Plaintiffs' claim in the alternative for unjust enrichment, McConnell argues that it defective on two separate grounds.

First, McConnell argues that the claim in the alternative fails the low bar of notice pleading, because Plaintiffs fail to specify what money or property McConnell holds belonging to MC. (McConnell's Memo at 11). As a threshold matter, McConnell does not cite any case law to support his proposition that any further degree of specificity as to the property at issue is required for an unjust enrichment. This is a theoretical point, however, as Plaintiffs have in fact alleged the property they say is at issue: customer lists and order specifications, vendor lists, and a number of items they contend constitute confidential and proprietary information and trade secrets. (*See, e.g., Compl.* at ¶ ¶ 71, 72, 77, 123-141). McConnell's argument is thus unavailing.

Second, McConnell disregards well-established law allowing for unjust enrichment to be pled in the alternative as an equitable backstop for an express breach of contract claim.

Unjust enrichment "is an equitable claim." *Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*, 211 N.C. App. 252, 264, 712 S.E.2d 670, 679 (2011). "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *JPMorgan Chase Bank, N.A. v. Browning*, 230 N.C. App. 537, 542, 750 S.E.2d 555,

559-60 (2013). There are five elements: (1) "one party must confer a benefit upon the other party;" (2) "the benefit must not have been conferred officiously;" (3) "the benefit must not be gratuitous;" (4) "the benefit must be measurable;" and (5) "the defendant must have consciously accepted the benefit." *Butler v. Butler*, 239 N.C. App. 1, 7, 768 S.E.2d 332, 336 (2015) (quotation omitted)). In other words, the facts must demonstrate that "property or benefits were conferred on a defendant under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 417, 537 S.E.2d 248, 266 (2000).

In the event Plaintiffs' breach of contract claim should fail, in whole or in part, the Court may still determine that Plaintiffs are entitled in equity to recoup some or all of the property they allege McConnell to have taken, or, more likely, the fruits gleaned by McConnell from that property's leverage for personal gain. In that case, the Court will need to fashion an equitable remedy, bearing in mind the conduct of all parties and the need to achieve an equitable result. This is why the alternative claim for unjust enrichment was designed, and why it should survive here.

## IV. Plaintiffs' UDTPA Claim Against McConnell (Count Ten)

Finally, McConnell argues that Plaintiffs' claim under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") should be dismissed in its entirety as to him. In doing so, McConnell argues in error that (1) Plaintiffs do not specify unfair or deceptive acts from McConnell capable of supporting the claim, and (2) McConnell's actions were not "in or affecting commerce." (McConnell Memo at 12-14).

"In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." N.C. Gen. Stat. § 75-1.1. *See Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 484-85, 593 S.E.2d 595, 600-01 (2004) (citation omitted). While it is true that "mere breach of contract does not constitute an unfair or deceptive act," it is also true that aggravating circumstances sufficient to trigger the statute "include conduct of the breaching party that is deceptive." *Becker v. Graber Builders, Inc*, 149 N.C. App. 787, 794, 561 S.E.2d 905, 911 (2002).

McConnell's assertions to the contrary notwithstanding, Plaintiffs have alleged extensively that McConnell conspired with at least two parties, Asterra and Rise Capital, to steal MC's business for themselves and coerce Plaintiffs into paying Asterra, McConnell's new employer, amounts it did not owe under any contract. (*See, e.g., Compl.* at ¶¶ 54, 69-70, 77, 79-81, 72, 77, 123-141). These allegations of conspiracy are more than enough to sustain a UDTPA at this threshold stage. *See Sellers v. Morton*, 191 N.C. App. 75, 83, 661 S.E.2d 915, 922 (2008) (North Carolina law does not recognize an independent cause of action for civil conspiracy; rather civil conspiracy is a theory of liability).

Nor, to address McConnell's other argument, are these allegations of a "mere employer-employee" dispute, which Plaintiffs agree would not support a UDTPA claim. *See HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593, 403 S.E.2d 483, 492 (1991) (citation omitted). Indeed, Plaintiffs do not contest that *if* Plaintiffs

had based their UDTPA claim against McConnell merely on breaches of the McConnell Employment Agreement, that UDTPA claim would be subject to dismissal. As discussed, however, that is not what Plaintiffs have done. McConnell's motion to dismiss Plaintiffs' UDTPA claim thus should be denied as well.

## RULE 15 STATEMENT

Plaintiffs believe that the allegations stated in its Complaint are more than sufficient to support the claims it asserts against McConnell. If, however, the Court believes that additional factual allegations are required with respect to any of the claims that are the subject of McConnell's pending motion to dismiss, Plaintiffs hereby seek leave pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to amend to add further specificity in lieu of dismissal of any pending claim.

## CONCLUSION

For the foregoing reasons, McConnell's Motion to Dismiss pursuant to Rule 12(b)(6) should be denied in its entirety.

[No further text on this page]

This the 4th day of November 2025.

**PARRY LAW, PLLC**

By:    <u>/s/ Jonah Garson</u>
        K. Alan Parry
        State Bar No. 31343
        Amos Tyndall
        State Bar No. 19309
        Jonah Garson
        State Bar. No. 55547
        The Europa Center
        100 Europa Drive, Suite 351
        Chapel Hill, NC 27517
        Phone: 919.913.3320
        Fax: 919.869.2600
        kap@parryfirm.com
        agt@parryfirm.com
        jag@parryfirm.com

        **COUNSEL FOR PLAINTIFFS MC BOTANICALS, LLC AND MC NUTRACEUTICALS, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been filed via the Court's CM/ECF system, which provides email notice to all counsel of record.

Respectfully submitted, this the 4th day of November 2025.

**PARRY LAW, PLLC**

By:   /s/ Jonah Garson